# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

---

|  |  |  |
|---|---|---|
| MP, by and through her Guardian, | : | |
| VC, and VC individually on her own behalf, | : | |
| | : | |
| | : | |
| *Petitioners*, | : | Case No: 5:20-cv-4447 |
| | : | |
| v. | : | |
| | : | |
| Parkland School District | : | |
| | : | |
| *Respondent.* | : | |

---

# COMPLAINT

# INTRODUCTION AND BACKGROUND

1. This matter arises as an appeal of an administrative decision regarding a Due Process Hearing under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.*

2. Petitioner, MP, is a student, who at all times relevant to the Due Process Complaint was living within the boundaries of the Parkland School District ("District"). VC is MP's Guardian, residing with MP.

3. Defendant Parkland School District is a Pennsylvania public school district and local educational agency ("LEA") under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1401-1482.

4. Pursuant to federal and state law, the District was the LEA responsible for providing MP a Free Appropriate Public Education ("FAPE") during his residence within the District.

5. This Court has federal question jurisdiction, 28 U.S.C. § 1331, and specific grant of jurisdiction under Section 615(a) of the IDEA, 20 U.S.C. § 1415(i)(2).

6. Venue properly lies in the Eastern District of Pennsylvania via 28 U.S.C. § 1391, as the Defendant School District lies within and the causes of action arose within this district.

1

7. The claims subject to this Complaint have been fully exhausted at the administrative level through a final Hearing Officer decision dated June 12, 2020. A copy of the decision is attached as Attachment A to this Complaint.

8. Petitioners seek to reverse the Hearing Officer's Decision and Order which incorrectly determined that MP was not denied a FAPE by the District in any respect November 17, 2017 through October 28, 2019, and that Student should not be awarded compensatory education.

9. Petitioners seek to reverse the Hearing Officer's Decision and Order which incorrectly determined that MP was not entitled to an independent educational evaluation, despite the finding that Parkland School District had violated Student's right to an independent educational evaluation.

10. Petitioners seek to recover reasonable attorneys' fees as a result of the Hearing Officer finding that Petitioners were a partially prevailing party.

## FACTS

11. MP was born November 9, 2001. MP is a high school student who has resided within the boundaries of the District at all times relevant to this complaint.

12. Parkland School District is the local education agency.

13. Student is enrolled in the 12 grade in the school district.

14. VC is not a native English speaker. S-7 at 2. MP's family speaks Spanish and requires translation services. S-3 at 6.[1]

15. MP is disabled due to a number of chronic and severe medical conditions, which include, but are not limited to, Rett's syndrome, complex partial seizures with impairment of consciousness, Cerebral Palsy, quardriplegia (diagnosed: spastic quadriplegic cerebral

---

[1] References to the administrative record throughout this complaint will be to the Notes of Testimony (N.T.), Parent Exhibits (P-) followed by the exhibit number, School District Exhibits (S-) followed by the exhibit number, Hearing Officer Exhibits (HO-) followed by the exhibit number, the Hearing Officer's Decision (HO Decision).

palsy), grand mal seizures (since the age of 18 months), global developmental delay,

developmental regression, oropharyngeal dysphagia, and scoliosis. P2 at 4, 56-57.

16. MP has been identified by the school district as having a disability and needing specially

designed instruction under the primary eligibility category of multiple disabilities and the

secondary category of speech language impairment.

17. At all times relevant to this complaint, Student has been assigned to the multiple

disabilities support - functional classroom operated by the Intermediate Unit at Parkland

High School, within the District. HO Decision at p. 4.

18. Around the start of the 2018-2019 school year, MP began losing weight, with the District

sending MP's lunches home with her on the bus, whereas, at home, MP had no issue

eating. (NT 667:1-669:15); *see* S8 at 10 (IEP dated 3/14/2018, memorializing Guardian's

prior "concerns with the amount that [MP] [was] sleeping at school and the lack of

liquids that she [was] consuming at school" and the "inconsistency of [MP] finishing all

of her food," noting that she did not have trouble getting MP to eat and drink at home).

19. Multiple requests were made by Student's medical providers for full-time nursing

services in school and educational and related services to be provided by the school in

MP's home during times she was unable to attend for medical reasons. *See, e.g.,* P-2 at 1

(home services); p. 4 (3 months homebound); p. 3, 13, 17 (one-to-one nursing requests

from multiple sources).

20. On November 9, 2018, MP's pediatric neurologist, Rohan Sheikh, MD, wrote the District

the following prescription for MP: "Home based school for 3 months – 5 hours/week,

including PT/OT/SP." P2 at 1-2.

21. On November 9, 2018, MP's pediatric neurologist, Rohan Sheikh, MD, provided the following reason for his request for MP: Seizure, Cerebral Palsy, Weight Loss, inadequate sleep. P2 at 1-2. The doctor stated that the reason this condition prevented MP from attending school is because she was "sleeping throughout the school day, missing lunch," "instruction," and "therapy." P2 at 1-2.

22. The District's Supervisor of Special Education "knew that there was a request for some sort of instruction in the home," relating to the documents submitted by Dr. Sheikh.  (NT 316:4-317:2).

23. On November 28, 2018, MP's doctor, Elaine S. Banerjee, MD (Dr. Banerjee), wrote the District that MP "has severe developmental delays due to Rett syndrome and is unable to participate in school and has significant medical needs including a feeding tube and seizure disorder." P2 at 3.

24. On January 29, 2019, MP's doctor, Elaine S. Banerjee, MD (Dr. Banerjee), wrote the District the following:

> [MP] is under my care. I recommend that she receive 5 hours/week of home bound schooling. Her medical needs including Rett syndrome, Complex partial seizures with impairment of consciousness, breakthrough seizures, and malnutrition with placement of gastronomy tube prevent her attending school. The frequent seizure activity is causing fatigue and sleepiness and preventing her from eating while at school. It is important for her health and safety that she remain at home to ensure that she is safe, stimulated, and being fed.
>
> I first saw [MP] on 11/28/18. The probable duration of her medical problems will be lifelong, and she will be re-certified every 3 months unless there is a significant change in her medical conditions.

P2 at 4.

25. On January 29, 2019, MP's doctor, Elaine S. Banerjee, MD (Dr. Banerjee), wrote the District a request for a temporary medical excusal for MP, requesting that MP receive 5

hours per week of educational instruction in the home. P2 at 5. Dr. Banerjee notified the District that the diagnosis requiring the temporary medical excusal was malnutrition with gastrostomy tube placement and complex partial seizure with impairment of consciousness. P2 at 5. Dr. Banerjee notified the District that MP was then-currently hospitalized for a seizure and was previously hospitalized for gastrostomy tube placement. P2 at 5.

26. On February 11, 2019, Dr. Banerjee wrote the District, notifying them that MP had been unable to attend school from 11/9/2019 until the then-present date due to medical reasons. P2 at 8. Dr. Banerjee then indicated that MP "will not be able to return to school and is in the process of arranging home-bound schooling." P2 at 8.

27. Jennifer Pammer, one of MP's teachers, expressed her belief that MP had never seized in her class, because she never witnessed MP's "whole body shaking." (NT 245:11-247:19). Although, Jennifer Pammer did witness MP with impaired consciousness in her class. *Id*. Jennifer Pammer also witnessed MP and tremoring in her class. *Id*. Nevertheless, Jennifer Pammer was MP's teacher for the 2018-2019 school year and the 2019-2020 school year, but never witnessed her seizure.

28. The District never issued a Permission to Reevaluate, including a request for consent to have a physician provide an evaluation to inform the District's educational program for MP.

29. The District never issued a Permission to Reevaluate, including a request for consent to have a physician provide an evaluation to inform the District's educational program for MP, despite their disagreement with MP's medical providers.

30. It is important to note that the MP's diagnosis of complex partial seizure with impairment of consciousness does not manifest with her whole body shaking. Rather, MP's diagnosis of complex partial seizure does manifest with the impairment of consciousness, as is made plain by the diagnosis.

31. On April 8, 2019, Guardian requested an independent educational evaluation consisting of the following assessments:

> An independent psychological evaluation at District expense, conducted by a bilingual psychologist (fluent in both English and Spanish), evaluator selected by the Guardian, and results utilized to develop an appropriate program and placement for [MP];

> An independent feeding evaluation by a feeding specialist trained, skilled and experienced in working with children with significant disabilities, selected by the Guardian, at the Parkland School District's expense, by an evaluator selected by the Guardian, with the results to be utilized to develop an appropriate program and placement for [MP];

> An independent physical therapy evaluation by a physical therapist trained, skilled and experienced in working with children with significant disabilities, selected by the Guardian, at the Parkland School District's expense, by an evaluator selected by the Guardian, with the results to be utilized to develop an appropriate program and placement for [MP];

> An independent Augmentative and Alternative Communication Evaluation (AAC) by an evaluator skilled and experienced in working with students with significant speech and language deficits, at the Parkland School District's expense, by an evaluator selected by the Guardian, with the results to be utilized to develop an appropriate program and placement for [MP]; and,

> An independent OT evaluation administered by an Occupational Therapist trained, skilled and experienced in working with children with significant disabilities, selected by the Guardian, at the Parkland School District's expense, by an evaluator selected by the Guardian, with the results to be utilized to develop an appropriate program and placement for [MP].

S-18.

32. The District never responded to this request by providing MP with the independent educational evaluation or filing for due process in order to defend their evaluation.

33. Further, they have not appropriately and comprehensively evaluated MP.

34. Because the District did not appropriately and comprehensively evaluate MP, the District did not provide an individualized educational program that was reasonably calculated to provide MP with an appropriate education in light of her circumstances.

35. But the District's failure to provide an MP with an individualized educational program that was reasonably calculated to provide MP with an appropriate education in light of her circumstances extends beyond the inadequacies of the District's evaluation.

36. When MP arrived at the District, the District began implementing an eye gaze goal. S-3 at 18; (NT 72:11-21).

37. Rachael Landis, MP's special education teacher during the 2017-2018 school year, testified that she would ask MP questions in English for the eye gaze goal and would send home MP's progress reports for this goal in English. (NT 72:22-73:10).

38. Rachael Landis testified that MP's baseline for the eye gaze goal was to be determined at the time of MP's IEP dated 11/20/2017, *see* S-3 at 19, and that it was zero at the time of MP's IEP dated 3/14/2018. *Compare* S-3 at 18 *with* S-8 at 19; (NT 74:3-74:15).

39. When MP arrived at the District, the District began implementing an alertness goal, which tracked if MP kept her eyes open when probed weekly. S-3 at 19; (NT 73:11-21). Rachael Landis testified that she did not think that MP achieved the alertness goal, acknowledging that MP's baseline for this goal was to be determined at the time of MP's IEP dated 11/20/2017, *see* S-3 at 19, and was 8.6% at the time of MP's IEP dated 3/14/2018. *Compare* S-3 at 19 *with* S-8 at 20; (NT 74:19-77:1). As Rachael Landis testified, this alertness goal "would have been timing her ability to participate in the classroom and getting a percentage from the trial[s]." (NT 74:24-77:1).

40. Based upon the District's testimony, MP was only able to participate in the classroom for 8.6% of the time during the 2017-2018 school year. (NT 74:19-77:1).

41. The IEP dated 3/14/2018 memorialized Guardian's "concerns with the amount that [MP] [was] sleeping at school and the lack of liquids that she [was] consuming at school. She also stated some concern with the inconsistency of [MP] finishing all of her food," noting that she did not have trouble getting MP to eat and drink at home. S8 at 10.

42. At the 3/14/2018 IEP Meeting, MP's Guardian "mentioned that she contacted an agency about nursing and asked if… school felt that a nurse was medically necessary." S8 at 10.

43. The District admitted that MP's "sleeping sometimes affects" her ability to participate in inclusive activities. S8 at 11.

44. MP has been identified as having a speech or language impairment. She was reevaluated for speech and language in or around March of 2018 by Alyssa Krebs.

45. According to the District's own notes, at the 3/14/2018 IEP meeting, Alyssa Krebs, the speech pathologist that conducted MP's speech evaluation was noted as recommending "consult [services] only due to the inability to gain understanding of speech needs due to excessive sleeping during the day." P2 at 47; *see* (NT 617:21-618:19) (Valerie Gylycz testifying to the documents authenticity and characterization of the notes being taken in the normal course of business).

46. Alyssa Krebs testified that she could not identify any recommendations that she provided in MP's reevaluation report to address MP's speech and language impairment, nor did she identify any of MP's strengths or weaknesses relating to MP's speech and language impairment. (NT 433:4-433:2).

47. Alyssa Krebs testified that she was not responsible for the identification of MP's functional communication needs and the indication that they were exploring eye gaze to address those needs. (NT 433:16-433:19). Rather, Alyssa Krebs attributed the related portions of MP's reevaluation report to MP's special education teacher.  (NT 433:16-433:22).

48. Neither of MP's special education teachers—Rachael Landis was MP's teacher during the 2017-2018 school year, and Jennifer Pammer taught MP during the 2018-2019 and 2019-2020 school years—had any background as a speech pathologist, a speech therapist, or a speech and language specialist. S-1, S-2.

49. The input derived from Alyssa Krebs' speech and language evaluation, indicated that MP "sleeps throughout most of the school day. She is awake and alert for brief amounts of time throughout the school day, at which time she demonstrates poor awareness…." S-8 at 8.

50. Alyssa Krebs indicated that MP was unable to communicate using eye gaze, a switch, or operate a cause and effect object. S-8 at 8.

51. But Alyssa Krebs did not trial any high-tech devices with MP, such as those that use eye gaze tracking software to determine whether such applications may be of any use to MP.

52. When asked about MP's goal, which requires MP to use eye gaze in order to select an answer, *see* S-3 at 45, Alyssa Krebs stated that the goal was not a speech or language goal. (NT 431:5-16). Rather, she considered MP's eye gaze goal "a special education goal" that is "out of her scope of practice," (NT 431:15-16), which she neither wrote nor monitored, (NT 432:16-20). Nevertheless, Alyssa Krebs stated that she did "consult with [MP's] teacher in regards to the eye gaze goal." (NT 430:15-22)

53. When asked about MP's goal involving the use of eye gaze, Alyssa Krebs stated that she did not write a speech and language goal for MP, because she only provided consultation services to MP's teacher for 40 minutes per month in order to work on MP's "foundational skills" and "ability to eye gaze manually between two objects to make a choice, and then further her communication that way." (NT 431:5- 435:5).

54. According to the District's own notes, based upon a conversation that Sherri Deeb (District's head of nursing) had with Darlene Santos on 11/19/2019 (Ms. Santo was a social worker for MP's Pediatric Neurologist, Dr. Sheikh), Dr. Sheikh did not feel MP's sleep issues were related to medication. P2 at 47; *see* (NT 617:21-620:15) (Valerie Gylycz testifying to the documents authenticity and characterization of the notes being taken in the normal course of business).

55. On April 8, 2019, Guardian, through counsel, requested "*Immediate* assignment of a one-on-one Nurse *and* a 1:1 personal care assistant to be with [MP] at all times (from the time she is picked up to the time she is dropped off)." P7 at 3.

56. On April 24, 2019, the school district, by counsel, responded to the request for an independent educational evaluation, stating that the guardian unilaterally withdrew the student from school on November 8, 2018, without mentioning the prior doctor's notes that were received on behalf of MP. S-19; NT 193.

57. The school district did not file a due process complaint or offer to pay for the independent evaluation in response to the request. HO Decision at 13.

58. On May 8, 2019, MP's doctor, Elaine S. Banerjee, MD, wrote the District the following:

> [MP] is currently under my care. Based on her history of Rett syndrome, cerebral palsy, spastic quadriplegia, seizure disorder, and poor feeding with gastrostomy tube in place, it is medically necessary for [MP] to have a one-to-one certified registered nurse (RN) present with her, throughout the school day from drop-off

to to pick-up, to supervise medical treatment of her seizures, feeding, and appropriate toileting schedule.

P2 at 13.

59. On May 13, 2019, Sheri Deeb wrote to [MP]'s aunt, SO, and a number of PSD

employees the following in regards to Dr. Banerjee's medical requests:

> I received a fax from Dr. Banerjee today requesting various accommodations for [MP]. I have reached out to Dr. Banerjee for more information and will follow up as soon as we connect. One item Dr. Banerjee requested is a 1:1 nurse for [MP] while she is transported to and from school. I will be communicating with Dr. Banerjee about that request in addition to the others. In the meantime, in an abundance of caution, if you are uncomfortable sending [MP] to school by bus, you may transport her to and from school and the District will reimburse your mileage at the IRS rate of 58 cents per mile. If you believe [MP] can safely ride the bus while we coordinate with Dr. Banerjuee, you can continue to send her by bus.

P2 at 14-16.

60. On May 16, 2019, MP's doctor, Elaine S. Banerjee, MD, wrote the District the following:

> "As per my previous letter, my opinion regarding [MP]'s care is that due to her complex medical conditions, could be managed by a one-to-one certified nurse with her throughout the entire day. As an alternative, the school-based IEP team could consider instruction in the home at this time to meet her education needs while providing for her health and safety.

P2 at 17.

61. During the 2018-19 school year, MP had over 93 absences due to medical reasons. P5 at

1-3; S-17 at 1-3.

62. All of the days she missed that are accounted for on the attendance records produced by

the District equal 93, and all were excused. *Id.*

63. The attendance records produced by the District only include up until 3/29/2019. *Id.* at 3.

64. In addition to those excused absences that are reflected in the attendance records produced by the District, we know that she continued to miss school up until May 6, 2019, since it is documented in her IEP. S-14 at 7.

65. Soon after her return on May 6th and 7th, MP had to miss school again due to hospitalization. *Id*. Then there was a death in the family for which she missed a few days of school. (NT 732:12-25). From May 7, 2019 through June 7, 2019, MP was absent 10 days. S-14 at 7.

66. So, excluding weekends and major holidays, from April 1, 2019 until May 3rd, MP missed an estimated 24 days of school, plus an additional 10 days of school after that, which brings the total absences during the course of the 2018-2019 school year to 127 days.

67. In addition, while she was supposed to receive ESY during the summer of 2019, MP was hospitalized again. (NT 295:19-23).

68. At no time during the year did the District provide MP with a temporary medical excusal, instruction in the home, or any other educational or related services to MP while she was unable to attend school due to her medical condition, despite medical notes and requests made for MP to receive educational and related services in the home while she was unable to attend school due to her medical needs. (NT 683:3-685:3).

69. MP's daily logs provide the following information for the 2018-2019 school year:

   - **09/11/2018**: MP was very sleepy on this day and only ate a little bit of lunch. S-13 at 1.
   - **09/12/2018**: MP seemed tired, but she was awake almost all day. S-13 at 2.
   - **09/13/2018**: She slept for most of the day, including for her student ID picture. She ate a small amount of lunch. S-13 at 3.
   - **09/17/2018**: MP seemed very uncomfortable this morning and her stomach felt hard. S-13 at 4.

- **09/20/2018**: MP slept most of the day. She ate and drank very little. The teacher indicated that she needed a Seizure Protocol for MP as soon as possible. Teacher indicated she would call Guardian on September 24, 2018 at 1:20pm to discuss Guardian's concerns. S-13 at 5.
- **09/24/2018**: MP ate very little of her lunch.Teacher apologized for not calling as planned. Teacher also sent home seizure protocol and advised Guardian that she should "contact [MP]'s Neurology doctor about her increase of seizure activity." S-13 at 6.
    - The attached Seizure Protocol, written in English, identifies that MP has complex partial seizures and that for any seizure lasting more than 5 minutes, they are to provide MP with Diastat 10mg, which Guardian signed and returned. S-13 at 8.
- **09/27/2018**: MP ate about ¾ of her lunch. She was awake and alert during the afternoon. Teacher requested more pants be sent into school. S-13 at 9.
- **10/02/2018**: MP woke up around 11:30pm. She "termored for a few seconds and then was sound asleep until around 2:10pm. She was too sleepy to eat lunch. S-13 at 10.
    - When pressed on whether this tremor was a seizure, MP's teacher admitted that she was "not a medical doctor" and was "not really sure" how to differentiate a tremor from a seizure, but remained adamant that "it was not a seizure" because she "would have called the nurse and followed [] protocol." (NT 245:11 - 246:6).
- **10/25/2018**: MP slept for about half the day. She was awake to eat her lunch. The teacher indicated that MP "is often very deeply asleep and will not wake up." S-13 at 11.
- **4/25/2019:** MP's teacher sent home an invitation to an annual IEP meeting to be held Friday, May 3, 2019 at 8:30 AM. S-13 at 12-13. This was one of the earliest official school form documents that the District produced in this matter, which was provided to Guardian in her native language, *see* S-3 - S-13, only weeks after counsel wrote to the School District's attorney earlier the same month, S-18.
- **4/30/2019:** MP's teacher sent home an invitation to an annual IEP meeting to be held Friday, May 3, 2019 at 8:30 AM. S-13 at 16-21.
- **5/13/2019:** MP ate ⅓ of her pureed food over 30 minute period. S-13 at 29. Teacher sent home IEP documents. MP's teacher sent home an invitation to an annual IEP meeting that was held Friday, May 3, 2019 at 8:30 AM, with highlighted section for directions, sign and date. S-13 at 23-28. She also sent home the Parental Consent to Excuse Members From Attending thee IEP Team Meeting, requesting Guardian to sign and date. *Id*. She also purportedly sent home the Procedural Safeguards in Spanish and a Family Reference guide in Spanish. *Id*.

13

- **5/15/2019:** MP ate all of pureed egg salad**.** S-13 at 31.
- **5/16/2019:** She was awake all day. MP ate ⅔ cup of pureed food and all of her pudding. And she attended a chorus performance. S-13 at 32.
- **5/17/2019:** MP was sleeping and only received a few spoonfuls of her pureed food. Her medicines were given during her tube feeding. S-13 at 33.
- **5/20/2019:** MP went on a field trip. She slept through both snack and lunch, then woke up around 11:45am. She had her g-tube feeding around 11:45am. S-13 at 34.
- **5/21/2019:** MP woke up around 11:15am. She ate ¾ of pureed food and 2 mini cupcakes, pureed with ½ container vanilla yogurt. S-13 at 35.
- **-5/22/2019:** MP slept all day and did not eat anything by mouth. S-13 at 36.
- **5/24/2019:** MP ate ¾ of pudding and a few spoonfuls of pureed food. S-13 at 37.
- **5/28/2019:** MP ate all of pureed food in container. S-13 at 38.
- **5/29/2019:** MP ate all of pureed food in container and an entire container of yogurt. S-13 at 39.
- **6/10/2019:** MP ate 5 ounces of rice pudding S-13 at 40.
- **6/11/2019:** MP ate yogurt and osmolite. S-13 at 41.

70. Of the 23 day accounted for in her daily activity log, MP attended 21.

71. Her sleep was tracked to some extent on approximately 12 of those days. On at least four days during which her sleep was tracked, she slept most of the day: 09/13/2018, 09/20/2018, 10/02/2018, 5/22/2019. On roughly six days she slept a significant portion of the day: 09/11/2018, 09/27/2018, 10/25/2018, 5/17/2019, 5/20/2019, and 5/21/2019, and she was awake the entire day on two occasions (09/12/2018, 5/16/2019). Beginning June 12, 2019, MP was in the hospital for two days in intensive care. (NT 689:18-19). That same day, on June 12, 2019, A truancy letter with Andrew Weber's name on it was sent to Guardian, regarding MP's absences. P2 at 35 (NT 312:21-23).

72. Parkland School District's Supervisor of School Health and Wellness, Sherri Deeb, did not capitulate to the request for a full-time one-to-one nurse until she wrote the following in a letter on September 9, 2019:

[MP] is a 12th grade student at Parkland High School. [MP] has multiple medical diagnoses including Rhett's Syndrome, Cerebral Palsy and Seizure disorder. [MP]'s private duty nurse would accompany her on the bus, which picks her up at approximately 8:00 AM and drops her off at approximately 3:40 PM. [MP]'s typical transportation ride is one (1) hour or less to and from school.

[MP] is in the Intermediate Unit Multiple Disabilities classroom. [MP] attends this classroom within Parkland High School Monday- Friday. School begins at 7:40 AM and ends at 2:53 PM. The school is currently providing [MP] with occupational therapy, physical therapy, speech therapy, feeding therapy, along with her education. The classroom teacher's primary responsibility is to educate the children in academics and functional skills. The maximum number of children, permitted by law, is eight (8) for this type of classroom, and the maximum number of adults would be two (2).

[MP]'s medical needs include, but are not limited to, tube feedings, toileting, positioning, and seizure monitoring.

Individual nursing services would be very helpful in providing the degree of individual monitoring required for [MP]. Our current Certified School Nurse to student ratio is approximately 3:3199. We would appreciate your consideration of these nursing services during the school day for the 19-20 school year.

P2 at 18.

73. During the 2019-2020 School Year, up until the date the amended complaint was filed on October 18, 2019, MP was denied her right to a free appropriate public education.

74. A snapshot from MP's daily logs, when juxtaposed to her IEP and Progress report, shows that MP's IEP was neither reasonably calculated to provide her a FAPE and not being followed.

75. Her daily logs provide the following information for the 2019-2020 school year, up until October 17, 2019:

- **09/03/2019**: She went to the nurse, did not eat by mouth, and slept all day. S-13 at 43.
- **09/04/2019**: She stayed in her seat/area; she received a group speech lesson and adaptive PE; she was "awake for most of the day"; and her teacher indicated that she needs briefs. S-13 at 44.

- **09/05/2019**: She stayed in her seat/area; she did not receive adaptive PE, speech, OT, or PT; and her teacher indicated that she was wet two times throughout the day and needed diapers and pants. S-13 at 45.
- **09/06/2019**: "She Slept most of the day." S-13 at 46.
- **09/09/2019**: She slept the entire day. Her teacher thanked Guardian for sending briefs and noted that MP needs to bring a change of clothes to school. S-13 at 47
- **09/10/2019**: She participated in group work, with visual prompts, she hung out with friends and completed class work with support. S-13 at 47
- **09/12/2019**: She participated in group work, with visual prompts, she hung out with friends and completed class work with support. S-13 at 47
- **10/01/2019**: She slept until around 1:30 pm and was changed twice when wet throughout the day. S-13 at 54.
- **10/02/2019**: Student was awake all day. She seemed uncomfortable at times. But, when they repositioned her, she seemed to feel better. She was wet when they changed her on two occasions. P-15 at 24.
- **10/03/2019**: Student woke around 1:15 PM. She was awake and alert the rest of the day, "watching videos about the weather, days of the week and months of the year." She was wet when they changed her on two occasions. P-15 at 23. **As noted by her Guardian, watching videos is an effective strategy for keeping her awake and alert. (NT )**
- **10/04/2019**: Student was awake and alert for a field trip to Cedar Beach Park; she enjoyed seeing all the other students in the classroom at the park; and she was wet when they changed her on two occasions. P-15 at 28.
- **10/08/2019**: Student woke around 1:30 PM; she was wet when they changed her on two occasions; and wet pants were sent home in her book bag. P-15 at 21.
- **10/11/2019**: Student was awake for most of the day; she expressed discomfort throughout the day; they repositioned, and she seemed to feel better for a little while; and she was wet when they changed her on two occasions. P-15 at 25.
- **10/15/2019**: Student was awake off and on throughout the day; she was introduced to the new Science unit, High School Science Fair; she was also introduced to science vocabulary words; she was wet when they changed her on two occasions. P-15 at 29.
- **10/16/2019**: Student was awake for the entire day; she had a group speech lesson, ate ¼ cup of food, and seemed happy; she was wet when they changed her on two occasions. P-15 at 27.
- **10/17/2019**: Student was awake for the entire day; she went to the library and seemed happy; and she was wet when they changed her on two occasions. P-15 at 26.

76. Despite being in attendance on at least 16 days and on 5 separate weeks between 9/03/2019 through 10/17/2019, Student's IEP was not being followed while she was in school.

77. For instance, despite being in attendance on at least 16 days and on 5 separate weeks between 9/03/2019 through 10/17/2019 (and not including any dates subsequent to 10/17/2019), MP's progress report from November of 2019 indicates that MP only received one trial of her goal "to respond to auditory stimuli to increase her alertness by independently turning her head to the direction of the sound," even though the District was obligated to provide weekly probes. The District stated the following reason for failing to implement this goal: "Limited data was able to be collected due to student absences." S-16 at 4.

78. MP's absences were given in the progress report for MP's other goals in November of 2019, wherein the District indicates that she only received two trials of her goal to "actively participate by keeping her eyes open and completing 60% of the activity on each of 4 out of 5 total trials when probed weekly." S-16 at 3. Looking to the same progress report, MP had purportedly met this goal by June of 2019, at which point the District stated that she kept "her eyes open and completed 94% of the activities for 4 trials when probed weekly. *Id*.

79. So, on days that MP was in attendance, the District did not implement MP's IEP by conducting the probes necessary to gather data for her annual measurable goals.

80. Furthermore, on many of the days MP was in school she slept throughout much, if not most, of the day.

81. On many of the days MP was in school, she did not eat a well balanced meal consistent with the USDA guidelines.

82. At all times relevant to this complaint, MP qualified for a free or reduced lunch.

83. The District did not provide MP with a free or reduced lunch, despite the fact that she qualified.

84. At all times relevant to this complaint, the District did not puree MP's lunches for her.

85. At all times relevant to this complaint, the District failed to provide documents relevant to MP's special education program in Spanish on the District's website, including, but not limited to, the District's policies.

86. On many of the days MP was in school and her guardian sent in a lunch with her, the District did not feed her the lunch that was sent in.

87. On October 21, 2019, Student had a seizure at school and guardian was called to pickup MP, because the District did not have a nurse to accompany MP during transport.

88. The parties litigated the matter over the course of four hearing dates.

89. The Hearing Officer issued a decision on June 12, 2020.

**HEARING OFFICER OF DECISION**

90. The Hearing Officer's decision ruled partially in favor of Defendants, concluding that MP was not denied a FAPE by the District in any respect between November 17, 2017 through October 28, 2019, and that Student should not be awarded compensatory education. The Hearing Officer's decision ruled partially in favor of Defendants, ruling that the Petitioners had proven that the Defendants had violated MP's right to an independent educational evaluation, however, that the appropriate remedy was District-wide training for all those responsible for responding to such requests.

18

## **COUNT I: IDEA Section 6(i)(2) - Errors of Law and Fact**

91. Petitioners incorporate by reference all allegations set forth above and below.

92. The Hearing Officer made reversible error in several regards when issuing the attached Decision. The errors included both errors of law and fact.

### ***Procedural Error***

93. The law is clear:

> In matters alleging a procedural violation, a Hearing Officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies— (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decision making process; or (III) caused a deprivation of educational benefits.

94. 20 U.S.C. § 1415(f)(3)(E)(ii); *see* 34 CFR § 300.513(a)(2). The Hearing Officer did not apply this standard.

95. The District committed procedural error that was overlooked by the Hearing Officer.

96. Section 300.322(e) requires that the District take "whatever actions necessary to ensure that Parent understands the proceedings of the IEP team." This includes provision of interpreting services.

97. Here, Guardian's native language was not English. While it is true that Guardian attended IEP meetings, there was ample evidence to show that She did not "understand" these proceedings, which significantly impaired her participation.

98. The Hearing Officer misconstrues this legal requirements of understanding and instead concludes that participation is required. However, the participation and input is meaningless without understanding and the regulations and IDEA statutory construct favor substance over form when it comes to participation. The Hearing Officer never made these same considerations.

99. The Hearing Officer made further error in his determination of credibility regarding this issue. He concluded that the Guardian's statements in a previous complaint contradicted an amended complaint. Therefore, the Hearing Officer admitted to consideration of a Complaint that was not before him, which constitutes legal error.

100.    Further, the Hearing Officer fails to consider communication barriers in the perceived inconsistencies in answers.

101.    His overanalysis of these alleged inconsistencies shows that he was biased against this Parent. The District's testimony contained similar minor inconsistent statements that were ignored.

102.    The record evidence is preponderant that Guardian was denied meaningful participation and this denial significantly impaired Guardian's ability to participate in the development of Student's program. Therefore, Petitioners should have been awarded equitable remedy for this denial.

### *Substantive Denial of FAPE*

103.    The IDEA and implementing federal regulations require local education agencies to provide a "free appropriate public education" ("FAPE") to students who are eligible for special education. See 20 U.S.C. §1412. This entails that qualifying students will receive:

> "[A] special education and related services that—
> (A)  have been provided at public expense, under public supervision and direction, and without charge;
> (B)  meet the standards of the State educational agency;
> (C)  include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D)  are provided in conformity with the individualized education program required under [IDEA § 1414(d)]."

20 U.S.C. § 1401(9).

104.     Under Section 504 of the Rehabilitation Act of 1973, § 794 ("Section 504") and its

implementing regulations, 34 C.F.R. §§ 104.31 et seq., states and local educational

agencies (MPAs) must provide a FAPE to each qualified disabled child in elementary and

secondary school. For purposes of Section 504, a FAPE is "the provision of regular or

special education and related aids and services that (i) are designed to meet individual

educational needs of handicapped persons as adequately as the needs of non handicapped

persons are met and (ii) are based upon adherence to procedures that satisfy the

requirements of §§ 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b)(1).

105.     The Supreme Court observed that an IEP "is constructed only after careful

consideration of the child's present level of achievement, disability, and potential for

growth." *Endrew F. v. Douglas County Sch. Dist.,* 137 S.Ct. 988, 197 L.Ed.2d 335, 350

(2017). The IDEA "requires participating States to educate a wide spectrum of

handicapped children," and "the benefits obtainable by children at one end of the

spectrum will differ dramatically from those obtainable by children at the other end, with

infinite variations in between." *Id.* at 349-50 (citing *Rowley* at 206-09). The Court

explained that, "an educational program must be appropriately ambitious in light of [the

student's] circumstances… [and] every child should have the chance to meet challenging

objectives." *Id.* at 351.

106.     In accordance with MP's individualized educational program, all times relevant to

this complaint, MP was deprived of her right to an appropriate education. MP required

instruction in the home to accommodate MP's life threatening medical condition, but the

District did not provide her any instruction or related services during any of the time she

could not be in school due to her condition, which resulted in well over 100 excused

absences. When the District was notified that MP could return to school with a 1:1 nurse

throughout the day, the District did not provide a timely response and only afford MP the

1:1 nursing services on a handful of days. As a result of the District's failure to

accommodate MP's need for educational and related services in the home, despite

repeated requests made by MP's doctors, the District denied MP a free appropriate

education. As a result of the District's failure to accommodate MP's need for nursing

services throughout the school day, despite repeated requests made by MP's doctors, the

District denied MP a free appropriate education.

107.   The failure to implement MP's IEP denied her a FAPE.

108.   As set forth above in the facts, MP slept throughout much of the time she was in
school.

109.   Moreover, the District never grasped the nature of MP's complex partial seizures,

with unconsciousness, which account for her "sleeping" so frequently. In fact, one of

MP's teachers expressed her understanding that MP never seizures in her class, because

she never witnessed MP's "whole body shaking." (NT 245:11-247:19). Although, she did

witness MP unconscious and tremoring in her class. *Id*.

110.   Further, the District did not provide Student with IEPs reasonably calculated to

provide Student with a FAPE.

111.   The Hearing Officer states that: "The guardian contends that the school district denied
FAPE by failing to provide a sufficient number of trials on the student's IEP goals in
order to assess the student's progress." HO Decision at 23. Setting aside, for now, the
Hearing Officer's mischaracterization of Petitioner's claims, the Hearing Officer did not
apply the correct standard to his legal analysis.

112.     The Hearing Officer reasoned as follows, without providing any citations to authority:

> Applying the two-part test developed by the U.S. Supreme Court to this issue, it is
> clear that the guardian is not attacking the appropriateness of the student's IEP
> here. According to the Supreme Court, the only other way to prove a denial of
> FAPE would be an actionable procedural violation by the school district. The
> guardian has not proven an actionable procedural violation with regard to this
> issue.

HO Decision at 23.

113.     But this was not a procedural claim. It ought to have been considered with
Petitioners' broad claim for a substantive denial of FAPE, as set forth in the complaint.

114.     With regards to the substantive FAPE requirements, the Supreme Court has

underscored the statutory requirement that a free appropriate public education entail "a

special education and related services that—are provided in conformity with the

individualized education program required under [IDEA § 1414(d)]." 20 U.S.C. §

1401(9); *see Endrew F. v. Douglas County School District,* 137 S.Ct. 988, 994 (2017)

("A State covered by the IDEA must provide a disabled child with such special education

and related services 'in conformity with the [child's] individualized education program,'

or IEP. § 1401(9)(D).").

115.     As the Court opined in *Endrew F.*:

> "Even though 'Congress was rather sketchy in establishing substantive
> requirements' under the Act, *id.,* at 206, 102 S.Ct. 3034 **the Court nonetheless**
> **made clear that the Act guarantees a substantively adequate program of**
> **education to all eligible children**, *id.,* at 200-202, 207, 102 S.Ct. 3034; see *id.,* at
> 193, n. 15, 102 S.Ct. 3034 (describing the 'substantive standard ... implicit in the
> Act'). We explained that this requirement is satisfied, and a child has received a
> FAPE, if the child's IEP sets out an educational program that is 'reasonably
> calculated to enable the child to receive educational benefits.' *Id.,* at 207, 102
> S.Ct. 3034. For children receiving instruction in the regular classroom, this would
> generally require an IEP 'reasonably calculated to enable the child to achieve
> passing marks and advance from grade to grade.; *Id.,* at 204, 102 S.Ct. 3034; *see*

> *also id.,* at 203, n. 25, 102 S.Ct. 3034."

*Endrew F. v. Douglas County School District,* 137 S.Ct. 988, 995-996 (2017) (emphasis added)

116.     Here, the Hearing Officer ignores the substantive obligation to actually implement an IEP as written, which is made plain by the language of 20 U.S.C. § 1401(9), requiring that students receive a special education "in conformity with the individualized education program."

117.     IDEA is explicit with regards to when a procedural violation has occurred. The law is clear in this regard:

> In matters alleging a procedural violation, a Hearing Officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies— (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decision making process; or (III) caused a deprivation of educational benefits.

118.     The Hearing Officer only analyzes the District's failure to implement trials of the Student's goal, without going into any detail as to the other inadequacies with the MP's IEP and the District's failure to implement an individualized educational program that is reasonably calculated to meet the needs of MP. But this narrows the claims being brought by the Petitioners.

119.     At the outset, Hearing Officer attempts to justify narrowing Petitioners' claims, while acknowledging other issues clearer set forth in the complaint and at hearing. But, he gave those other claims little consideration, despite the clear focus placed upon those claims throughout:

> The amended due process complaint raised other issues that were not argued as violations in the guardian's post-hearing brief; specifically, issues pertaining to whether the student received adequate nutrition while at school and whether the student's alertness/sleeping during school was appropriately addressed by the school district. Although a lot of testimony and documentary evidence was

devoted to these issues, the guardian failed to address them in the arguments contained in the post-hearing brief. Accordingly, these issues are deemed to have been withdrawn by the guardian and they have been waived for purposes of this proceeding. Assuming arguendo that these issues were not waived by the guardian's failure to present any argument thereupon, the evidence in the record does not support these allegations by the guardian.

HO Decision at 3. But these facts were set forth in Petitioners complaint and highlighted in their brief. Petitioners set forth detailed assertions pertaining to MP's sleeping during the school day and not eating. The claims were expressed broadly to contend that MP's IEP was neither reasonably calculated to provide her a FAPE and not being implemented.

120.    The evidence on the record was clear that MP was sleeping at school, she was not being fed consistently at school, she was not drinking water, and her IEP was not being implemented.

121.    The Hearing Officer ignores these issues.

122.    Here, the Hearing Officer tries to excuse the District's obligations by stating that "the guardian kept the student out of school so frequently," before concluding that "it is not reasonable for the guardian to blame the school district" and that "[t]he guardian chose to not let the student attend school." HO Decision at 24. But "a child's entitlement to special education should not depend upon the vigilance of the parents[.]" *M.C. v. Central Regional School District*, 81 F.3d 389, 397 (3d Cir. 1996). Furthermore, as indicated by the multiple requests from MP's medical providers, MP had a medical condition that warranted instruction within the home, and the absences she accrued were for excused medical reasons. P2 at 1-8.

123.    The Hearing Officer cites to representations made by the District of conversations that allegedly took place with Darlene Santos, in which the District states that Ms. Santos informed representatives of the School District that MP's neurologist requested the

temporary medical excusal and instruction in the home on the basis of misrepresentations made by the guardian. HO Decision at 10. In other words, the Hearing Officer relied on hearsay to justify his conclusion that "the guardian has not established any medical or other reason why the student would need to be educated in the home." HO Decision at 28.

124.   But, from 11/9/2018 through 2/11/2019, the only first-hand evidence received from any of MP's doctors was consistent in providing MP with requests for medical excusals and requests for instruction in the home. P2 at 1-8.

125.   The requests came from more than one doctor, each of whom was familiar with MP's complex medical condition and felt it was a reasonable request to accommodate MP's educational needs in the home. P2 at 1-8.

126.   The Hearing Officer was not a medical professional and makes no claim to be one.

127.   Under IDEA's ederal regulations, the District was obligated to provide MP with related services that are required to assist her in benefiting from special education. 34 C.F.R. § 300.34. And this includes medical services provided by a licensed physician to determine a child's medically related disability that results in the need for special education and related services. C.F.R. § 300.34(c)(5).

128.   If there was any doubt as to the seriousness of Rett syndrome and the ways in which it manifests resulting in the need for special education and related services, then the District should have issued a Permission to Reevaluate, including a request for consent to have a physician provide an evaluation to inform the District's educational program for MP. This never occurred.

129.   IDEA underscores a school's obligations to offer a "continuum of alternative

placements" "to meet the needs of children with disabilities for special education and

related services," which, in some cases, would entail the provision of "home instruction."

34 C.F.R. § 300.115; *see* 34 C.F.R. § 300.39 ("Special education means specially

designed instruction, at no cost to the parents, to meet the unique needs of a child with a

disability, including" "[i]nstruction conducted...in the home….") So IDEA envisions a

situation in which an eligible student would require instruction conducted in the home.

130.   The District did not appropriately respond to MP's

### *Independent Education Evaluation (IEE)*

131.   On April 8, 2019, Guardian requested an IEE consisting of the following assessments:

> An independent psychological evaluation at District expense, conducted by a
> bilingual psychologist (fluent in both English and Spanish), evaluator selected by
> the Guardian, and results utilized to develop an appropriate program and
> placement for [MP];
>
> An independent feeding evaluation by a feeding specialist trained, skilled and
> experienced in working with children with significant disabilities, selected by the
> Guardian, at the Parkland School District's expense, by an evaluator selected by
> the Guardian, with the results to be utilized to develop an appropriate program
> and placement for [MP];
>
> An independent physical therapy evaluation by a physical therapist trained,
> skilled and experienced in working with children with significant disabilities,
> selected by the Guardian, at the Parkland School District's expense, by an
> evaluator selected by the Guardian, with the results to be utilized to develop an
> appropriate program and placement for [MP];
>
> An independent Augmentative and Alternative Communication Evaluation
> (AAC) by an evaluator skilled and experienced in working with students with
> significant speech and language deficits, at the Parkland School District's
> expense, by an evaluator selected by the Guardian, with the results to be utilized
> to develop an appropriate program and placement for [MP]; and,
>
> An independent OT evaluation administered by an Occupational Therapist
> trained, skilled and experienced in working with children with significant
> disabilities, selected by the Guardian, at the Parkland School District's expense,

by an evaluator selected by the Guardian, with the results to be utilized to develop an appropriate program and placement for [MP].

S-18

132. Per 34 C.F.R. Sec. 300.502.(b) the District is legally mandated to respond to IEE

requests in one of two specific manners:

(1) A parent **has the right** to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency

(2) If a parent requests an independent educational evaluation at public expense, the public agency must, **without unnecessary delay**, either -

(i) **File** a due process complaint to request a hearing to show that its evaluation is appropriate; or

(ii) Ensure that an independent educational evaluation is **provided at public expense**, unless the agency demonstrates in a hearing pursuant to §§ 300.507 through 300.513 that the evaluation obtained by the parent did not meet agency criteria.

133. Here, the District neither provided the IEE or filed for Due Process to defend their

evaluation. Decision p. 13 ¶ 48.

134. The law is clear that Petitioner "has a right to an independent educational evaluation"

and the District must respond to invocation of this right in a certain matter as described

above (provide the IEE or file to defend their evaluation).

135. The Hearing Officer correctly found that the District was "in violation of IDEA"

when responding to the Parent's right to an independent evaluation. Decision p. 19.

Further, he admitted that the regulations "leave no room" for alternative processes. Id. p.

30.

136. Instead of ordering an IEE, the Hearing Officer commits legal error and orders

training for staff responding to IEE requests. However, the statute is clear that "right"

which was violated was a to an IEE, and it runs contrary to the clear and obvious

statutory structure to order training for a violation of Parent's right to an IEE. The

Hearing Officer should have ordered the IEE. As noted above by the Hearing Officer, the

statutory construct is simple and strict, and the District violated this statute when

responding to the IEE as a matter of right.

137.    The decision to not award an IEE as a matter of right was an error of law.

138.    The Hearing Officer also made error of law and fact when determining that the

evaluation performed by the District was appropriate.

### *Compensatory Education*

139.    The IDEA grants a court reviewing an IDEA claim the authority to grant whatever
relief it "determines is appropriate." 20 U.S.C. § 1415(i)(2).

140.    The Hearing Officer committed a legal error when he determined that the District did
not deny MP of a FAPE.

141.    As a result of this legal error, the Hearing Officer did not analyze whether
compensatory education was due to Student.

142.    When a known violation occurs a remedy is necessary "to preserve a handicapped
child's right to a free education." *Id.* (citing *Jefferson County Bd. of Educ. v. Breen*, 853
F.2d 853, 857-58 (11th Cir. 1988)). Here, it is in the interests of judicial economy to
create the remedy necessary to preserve MP's rights.

143.    The Hearing Officer had broad authority to fashion an appropriate remedy and it was
necessary for him to do so to preserve MP's right to a free appropriate public education.
His failure to find that MP's rights had been violated and provide a remedy for the
violations was reversible error, and to uphold such a decision would render IDEA and
504 protections meaningless.

144.    Appropriate remedies under the IDEA are determined on a case-by-case basis. In
each case, a court will evaluate the specific type of relief that is appropriate to ensure that
a student is fully compensated for a school district's past violations of his or her rights
under the IDEA and develop an appropriate equitable award. *D.F. v. Collingswood*

*Borough Bd. of Educ.*, 694 F.3d 488, 498-99 (3d Cir. 2012).

145.    The decision to not grant compensatory education was also based on factual error.

146.    The Hearing Officer heard copious evidence regarding MP's needs that were not met by the District. This evidence showed needs related to several areas in which compensatory services could have been provided.

147.    The Hearing Officer was aware of MP's needs and the services she required to be provided a FAPE. Here, Student's needs for nursing services and instruction in the home were well known by the District. The failure to implement these services and modifications creates a deprivation that cuts across all curricular domains. The record certainly supports a remedy, and the denial of a remedy based on the record was reversible factual error.

**COUNT II: Section 504 - Errors of Law and Fact**

148.    Petitioners incorporate by reference all allegations set forth above and below.

149.    For reasons similar to those under IDEA, the Hearing Officer decided not to remedy the school district's violation of IDEA's requirements concerning independent evaluations by granting MP an independent evaluation. The Hearing Officer made a reversible error by declining to remedy the school district's violation of IDEA's requirements concerning independent evaluations by granting MP an independent evaluation.

150.    Similarly, the Hearing Officer never addressed the school district's failure to timely provide for reasonable accommodations under Section 504, when MP's doctors requested accommodations. The District was notified of MP's disabilities and medical needs at school. The District did not timely provide MP with the necessary accommodations to allow MP safe access to school. The Hearing Officer failed to address these issues.

**COUNT V: SECTION 504 AND TITLE II DISABILITY DISCRIMINATION**

151.    Petitioners incorporate by reference all allegations set forth above and below.

152.    Pursuant to the ADA, no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services,

programs or activities of a public entity, or be subjected to discrimination by any such

entity. 42 U.S.C. § 12131.

153.    Student. is a "qualified individual with a disability" within the meaning of 42 U.S.C.

§ 12131 and § 12132. *See id.*

154.    The District is a "public entity" within the meaning of the ADA.  42 U.S.C. §

12131(1).

155.    The District is responsible for providing services, programs and or activities to school

age children who reside within the boundaries of the District.

156.    Title II of the ADA requires that public schools not discriminate against students on

the basis of their disability, and provide reasonable accommodation to students with

disabilities.

157.    The District's actions were intentional or otherwise deliberately indifferent when

discriminating against Student.

158.    By their aforementioned acts and omissions the District

a.   excluded Student from participation in, and denied her the

     benefits of, a service, program or activity made available to others;

b.   denied her the opportunity to participate in or benefit from an aid, benefit, or

     service on a basis that is equal to, and as effective as, that provided to others; or

    c.   provided her with insufficient accommodations, benefit or service that was not as

       effective in affording equal opportunity to obtain the same result, to gain the same

       benefit, or to reach the same level of achievement as that provided to others;

and thereby discriminated against Student on the basis of her disabilities.

159.    The District had actual knowledge of Student's complex needs and knowingly and

deliberately chose to deny Student reasonable accommodations and services

commensurate with the known needs. Further, the District went as far as disenrolling

Student and completely denying services when medical needs were not accommodated.

160.    Similarly, Section 504 and its implementing regulations, 34 C.F.R. Part 104 *et seq.*,

require that federal funds recipients provide students with disabilities access to FAPE and

prohibit the exclusion of, or discrimination against, any otherwise qualified individual

with a disability.

161.    As discussed herein, Student is disabled as defined by Section 504, she is "otherwise

qualified" to participate in the school's programs and activities, and he was excluded

from participation in, denied the benefits of, or subject to discrimination at, the school.

162.    Student was intentionally discriminated against in violation of Section 504 when the

District, *inter alia,* failed to provide nursing services, allowed student to go without food

and water in school while she was suffering from partial complex seizures with impaired

consciousness, denied MP's doctors' request to provide her with educational services in

the home, provided the school district's policies available online in English only, failed to

provided translated documents to guardian relating to MP's educational program, called

the guardian to pick up MP when she had a seizure in school because the District did not

have a nurse to accompany MP during transport, and disenrolled Student based on

disability based struggles.

163.    As a result of these denials, MP lost a significant amount of weight and had to have a

gastrostomy tube placed, missed over one hundred days of school

164.    As a result of the District's discrimination Plaintiffs sustained actual damages

including, monetary, emotional, physical, educational, social, behavioral, and other

psychological/medical damages.

165.    The violative actions by the District were carried out with full knowledge that they

were violating Plaintiff's rights, and the District was intentionally violative of these well

established rights.

166.    The District's actions in violation of Student's rights constitutes deliberate

indifference.

167.    WHEREFORE, Plaintiffs demand judgment against Defendant awarding Plaintiffs

compensatory damages, attorneys' fees, expert fees and costs incurred during this Court

as permitted and any such other relief as the Court deems equitable and just.

**COUNT IV: IDEA SECTION 615(I)(2)(C) - Additional Evidence**

168.    Petitioners incorporate by reference all allegations set forth above and below.

169.    In the event the matter is not decided as a matter of law, Petitioners request pursuant

to 20 U.S.C. § 1415(i)(2)(C)(ii), that the Court accept additional evidence regarding MP's

medical conditions, the type and form of services MP requires to receive an appropriate

education and how any inadequacies in the past programming measures may be remedied

via a compensatory education award.

170.    Petitioners expect that this evidence might include, expert testimony on MP's medical

conditions, educational needs, expert testimony on specific uses of Compensatory

Education that could benefit MP, a review of the additional services that MP is currently

receiving due to the historical lack of programming by Defendant, progress reporting

under the current programming, and any other evidence necessary to formulate an

appropriate order of equitable relief.

171.   Such additional evidence will prove that Petitioners are owed relief for denial of a

FAPE under both section 504 and IDEA

172.   Such additional evidence will prove that Petitioners are owed relief for violations of

Title II and section 504 for deliberate indifference.

**COUNT V: IDEA SECTION 20 U.S.C. § 1415(i)(3)(B)(i)(II) - ATTORNEYS' FEES**

173.   Petitioners incorporate by reference all allegations set forth above and below.

174.   Via the Decision on June 12, 2020, Petitioners prevailed on one the claims made in

the Due Process matter.

175.   Therefore, Petitioners are entitled to reasonable attorneys' fees for the results they

achieved.

176.   Additionally, due to error by the Hearing Officer noted above, Petitioners also seek

attorneys' fees for the entire matter including the instant appeal.

177.   Defendant never made a written offer pursuant to 20 U.S.C. § 1415(i)(3)(D), so the

District cannot limit recovery based upon a settlement offer.

178.   Petitioners are entitled to reasonable attorneys' fees.

WHEREFORE, Petitioners respectfully request that this Court:

a.   Receive the administrative record;

b.   Receive additional evidence;

c.  Reverse the Hearing Officer's Decision and Order by finding that MP was denied a FAPE at some point between November 17, 2017 through October 28, 2019.

d.  Reverse the Hearing Officer's final Decision and Order dated June 12, 2020 by awarding compensatory education to MP for the denial of FAPE found;

e.  Affirm the  Hearing Officer's final Decision and Order dated June 12, 2020 by finding that the school district violated IDEA's requirements concerning independent evaluations.

f.  Reverse the Hearing Officer's final Decision and Order dated June 12, 2020 by awarding MP an independent evaluation;

g.  Award Petitioners reasonable attorney's fees and costs;

h.  Award monetary damages for the District's intentional discrimination and resulting damages;

i.  Grant such other relief as is appropriate.

September 10, 2020                         Respectfully submitted,

                                          /s/ Andrew Paul Schweizer, Esq.
                                          ═══════════════════════════

                                          **Andrew Paul Schweizer**
                                          PA Bar ID# 325083
                                          110 Chipmunk Lane
                                          Media, PA, 19063