UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MP *by and through her guardian* VC, | : | |
| and VC, *individually on her own behalf*, | : | |
| Petitioners and Counter Defendants, | : | |
| | : | |
| v. | : | No. 5:20-cv-04447 |
| | : | |
| PARKLAND SCHOOL DISTRICT, | : | |
| Respondent and Counter Claimant. | : | |

**O P I N I O N**
**Defendant's Motion for Judgment on the Administrative Record—ECF No. 23**
**Plaintiffs' Motion for Summary Judgment—ECF No. 24**

**Joseph F. Leeson, Jr.**                                     **August 25, 2021**
**United States District Judge**

## I.    INTRODUCTION

This matter involves a decision rendered by Certified Hearing Officer (CHO) James Gerl

in the case of Parkland High School student MP.  MP, through her guardian VC, alleges that

Parkland School District failed to provide her a free appropriate public education (FAPE) as

promised by the Individuals with Disabilities Education Act (IDEA) and that Parkland's actions

amounted to discrimination on the basis of MP's disability in violation of both the IDEA and the

Americans with Disabilities Act (ADA).  Plaintiffs also allege that Parkland failed to

appropriately respond to their request for an Independent Educational Evaluation (IEE).  The

CHO ultimately concluded that Parkland provided MP a FAPE and that MP was not

discriminated against on the basis of her disability.  The CHO did conclude, however, that

Parkland had violated 34 C.F.R. § 300.502(b)(2) by failing to take appropriate action in response

to MP's request for an IEE.  Thereafter, VC filed a Complaint before this Court, seeking this

Court's review of those claims on which Parkland prevailed before the CHO.  VC now files a

motion for summary judgment,[1] and Parkland seeks judgment in its favor on the administrative record.

After review of the administrative record under the appropriate standards, this Court grants in part and denies in part the motions of both parties.  As to Plaintiffs' claim that MP was denied a FAPE, Plaintiffs' Section 504 discrimination claim, and Plaintiffs' ADA discrimination claim, judgment is entered in Parkland's favor.  As to Plaintiffs' claim that Parkland failed to appropriately respond to Plaintiffs' request for an IEE, judgment is entered in Plaintiffs' favor, and this Court reverses the CHO's prescribed relief for this violation.  Parkland's counterclaim is dismissed.  Finally, as Plaintiffs are the prevailing party on a significant issue in this litigation, they may recover reasonable attorney's fees from Parkland as more fully set forth below.

## II.    PROCEDURAL BACKGROUND

On August 28, 2019, VC initiated due process proceedings on behalf of MP.  *See* Pls.' Mot. 2, ECF No. 24.  On October 28, 2019, VC amended her due process complaint.  Following a series of hearings, on June 12, 2020, the CHO issued a final decision, concluding (1) that Parkland provided a FAPE to MP, (2) that MP was not discriminated against on the basis of her disability in violation of the IDEA or ADA, and (3) that Parkland had failed to respond appropriately to MP's request for an IEE.  On September 10, 2020, VC filed a Complaint before this Court, alleging that portions of the CHO's decision were based on both legal and factual error.  *See* Compl., ECF 1.  On November 16, 2020, Parkland answered the Complaint.  *See* Answer, ECF No. 10.

---

[1]    Despite entitling its motion one for "summary judgment," Plaintiffs withdrew their request to supplement the record on January 12, 2021.  *See* ECF No. 17.  Accordingly, the administrative record was not supplemented by either side.

Thereafter, on March 11, 2021, both parties filed cross-dispositive motions.[2]  Following a series of responses and replies, the motions are now ready for review.

## III.    CHO FINDINGS OF FACT

As matters involving the IDEA are highly fact-dependent, a full recitation of the facts leading to the instant Complaint is required.  On August 28, 2019, VC filed a due process complaint, alleging that Parkland violated several provisions of the IDEA.  *See* Hearing Officer Final Decision 1 ("HO/FD __").[3]  On October 28, 2019, VC filed an amended complaint. Therein, VC raised the following claims against Parkland:

(1)   A procedural violation of the IDEA in failing to provide documents to VC in Spanish;

(2)  A procedural violation of the IDEA in failing to provide a sufficient number of IEP goals;

(3)  A denial of a FAPE because MP's IEP did not provide for a one-on-one nurse;

(4)  A denial of a FAPE because Parkland did not provide MP educational services at home;

(5)  A violation of Section 504 based on the alleged IDEA violations; and

---

[2]       Parkland entitles its motion "Motion for Judgment on the Administrative Record," *see* Def.'s Mot. ECF No. 23, and Plaintiffs' entitle their motion "Motion for Summary Judgment, *see* Pls.' Mot.  Notwithstanding, this difference in nomenclature does not change this scope of this Court's review nor the standard that it must apply to the factual findings and legal conclusions of the CHO.  *See David G. v. Council Rock Sch. Dist.*, No. 06-1523, 2012 WL 123182, at *2 (E.D. Pa. Apr. 12, 2012) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993)).

[3]       The Administrative Record in this matter is split into four parts.  Generally, the record is referenced with the letter "R" followed by the part number and the ECF page number.  For example, "R1. 200" refers to the record, part 1, at page 200.  The CHO's Final Decision is referenced separately.

(6) A violation of 34 C.F.R. § 300.502(b)(2) because Parkland failed to appropriately

respond to VC's request for an Independent Educational Evaluation.

*See id.*

The CHO held four hearing sessions, during which twelve witnesses testified regarding these claims. *See id.* at 2. The CHO also received documentary evidence from both VC and Parkland. *See id.* Based on the testimonial and documentary evidence, the CHO made the following findings of fact.

At the time of the CHO's Decision, MP was eighteen years old, and she was enrolled in the 12th grade in Parkland School District. *See* HO/FD Findings of Fact ¶¶ 2-3 ("HO/FD FOF ¶ __"). MP, who was identified as having a disability and needing specially designed instruction, was assigned to the multiple disabilities support-functional classroom at Parkland Senior High School. *See id.* ¶¶ 5-6. Parkland was notified that MP has a history of grand mal seizures, Rett Syndrome, quadriplegia, and scoliosis. *See id.* ¶ 7. VC, MP's grandmother, is her legal guardian. *See id.* ¶ 11. VC's native language is Spanish. *See id.* ¶ 14.

**A. MP's Disabilities**

Prior to 2007, MP ambulated with a walker, communicated with eye contact and movements, and was learning to eat with assistance. *See id.* ¶ 12. In 2007, MP relocated to another territory, where her progress regressed due to a lack of special education services. *See id.* From 2009 until approximately fall of 2017, MP attended schools in three different states. *See id.* ¶¶ 12-13. On approximately October 10, 2017, MP enrolled in the Parkland School District. *See id.* ¶ 13.

Rett Syndrome is a "severe and regressive neurodevelopmental disorder occurring primarily in females." *See id.* ¶ 15. "Following an apparently normal early development, there

is a loss of communication and hand function.  Comorbidities include breathing dysfunction, scoliosis, epilepsy and gastrointestinal disorders.  Feeding difficulties and poor muscle tone are also common." *See id.*  MP cannot communicate verbally, and she does not appear to react directly to verbal stimuli in either English or Spanish. *See id.* ¶ 16.  MP requires "hand-over-hand" assistance to complete school tasks, and she is entirely dependent on adults for self-care, toileting, and feeding. *See id.*

### B.  MP's First Individualized Education Plan (IEP)

On November 17, 2017, Parkland convened an IEP team for MP. *See id.* ¶ 17.  The resultant IEP included two goals for MP to meet, relating to eye-gaze communication and in-class alertness. *See id.*  This IEP was comparable to the education services that MP received through her IEP in her previous school. *See id.*  At that IEP meeting on November 17, 2017, VC and MP's aunt indicated to Parkland that it would be appropriate to send home documents regarding MP in English. *See id.* ¶ 18.  With respect to IEP team meeting and telephone conferences, Parkland arranged for an interpreter service to translate those events into Spanish for VC. *See id.* ¶ 19.  VC "actively participated at the IEP team meeting and provided input to the IEP team on a number of issues." *See id.* ¶ 20.

At school, MP received a "standard functional curriculum," which included personal care and toileting assistance. *See id.* ¶ 21.  MP also received weekly speech and language sessions. *See id.*  MP attended music class, during which she had the opportunity to interact with nondisabled peers. *See id.*  MP also attended library and adaptive physical education classes. *See id.*

MP frequently slept during class, but she was also alert for periods of time. *See id.* ¶ 22.  School staff used strategies including music, textures, and physical movement to improve MP's

alertness.  *See id.*  These strategies were designed to meet MP's IEP goal related to her in-class

alertness.  *See id.*

### C.  MP's Reevaluation and Second IEP

On November 20, 2017, Parkland issued a "Permission to Reevaluate" MP to VC.  *See

id.* ¶ 23.  VC returned the form to Parkland in January of 2018.  *See id.*  Prior to receiving the

form, Parkland consulted with the Intermediate Unit's feeding team, enlisting the team to

observe MP in the classroom and advise on her nutritional needs.  *See id.* ¶ 24.  On March 2,

2018, Parkland completed an Evaluation Report for MP.  *See id.* ¶ 25.  The findings in the report

were based on multiple assessments, which included "a review of records, input from the

guardian, an observation by a certified school psychologist, teacher input and assessments by

related service providers, including an occupational therapist, a physical therapist, and a speech

language pathologist."  *See id.*  In particular, the speech and language assessment included

analysis of "augmentative and assistive communication needs" of MP.  *See id.*  The analysis

evaluated MP "in all areas of suspected disability," and the entire evaluation was coordinated by

an experienced certified school psychologist.  *See id.*

In light of the reevaluation, a new IEP was developed for MP on March 14, 2018

("March IEP").  *See id.* ¶ 26.  The March IEP adds an additional goal to MP's previous

November IEP.  *See id.*  The new goal anticipates the use of auditory stimuli to help with MP's

alertness during the day.  *See id.*  The March IEP also included speech and language therapy, a

service that had not been provided to MP at prior school districts that she attended.  *See id.*

### D.  MP's Third IEP

Following the reevaluation, the school consulted with the Intermediate Unit to perform

another feeding evaluation of MP.  *See id.* ¶ 27.  This comprehensive assessment included an in-

class assessment of MP by the Intermediate Unit on March 26, 2018.  *See id.* ¶ 27.  The reevaluation resulted in recommendations, including some aimed at improving MP's liquid intake.  *See id.*  Parkland implemented the recommendations of the feeding team.  *See id.*  On May 7, 2018, Parkland prepared another Evaluation Report that incorporated the findings from the March reevaluation and May feeding reevaluation.  *See id.* ¶ 28.

Based on the May 7, 2018 Evaluation Report, a new IEP was developed for MP ("May IEP").  *See id.* ¶ 29.

### E.  MP's IEP Progress and Absence from School

MP made progress towards her IEP goals during the 2017–2018 school year.  *See id.* ¶ 30.  MP was eligible for "extended school year services"; however, VC did not send MP to extended school during the summer of 2018.  *See id.* ¶ 31.  MP was frequently absent from school.  *See id.* ¶¶ 32.  VC would often not send MP to school if it was cold outside or if VC experienced difficulties waking MP.  *See id.*  In most instances, VC would only notify Parkland of the absence after it had already occurred.  *See id.*

On November 8, 2018, VC stopped sending MP to school.  *See id.* ¶ 33.  MP did not return to school until May 6, 2019.  *See id.*  During this period, MP missed approximately 104 days of school, of which only ten were considered medical excusals.  *See id.*

On November 12, 2018, MP's neurologist sent Parkland a "Temporary Medical Excusal" form for MP.  *See id.* ¶ 34.  This form included a prescription from the neurologist for home-based schooling for MP for a period of three weeks.  *See id.*  In need of more information to carry out the temporary medical excusal, Parkland contacted MP's neurologist.  *See id.* ¶ 35.  The neurologist indicated to Parkland that MP "should be in school."  *See id.*  The neurologist's office further stated that no temporary medical excusal was being requested by the neurologist,

and the neurologist had issued the form because VC "represented to the neurologist that the school wanted the student to be home." *See id.*

On November 28, 2018, Parkland received a letter from MP's primary care physician. *See id.* ¶ 36.  The letter requested that VC be permitted to provide MP educational services through home schooling.  *See id.*  Parkland contacted the physician, who informed Parkland that VC had made a request that MP remain home.  *See id.* ¶ 37.  It was the opinion of the physician's office that MP remain in school.  *See id.*

Parkland's supervisor of health services consulted with Parkland's coordinator of special education and Parkland's supervisor of special education.  *See id.* ¶ 38.  After considering the opinions of MP's neurologist and primary care physician, both of whom indicated MP should be in school, Parkland declined to provide the educational services in MP's home.  *See id.*

On December 6, 2018, MP had a feeding tube placed.  *See id.* ¶ 39.  Prior to the placement of the feeding tube,  MP "did not need a one-on-one nurse in order to benefit from special education."  *See id.*  Parkland "assigned a certified school nurse to the student and had available other R.N.s and LPNs in its nursing office, if needed."  *See id.*

### F.  Efforts to Reintegrate MP into School

On January 21, 2019, the staff of MP's neurologist informed Parkland that VC was "adamant" that MP would not return to school.  *See id.* ¶ 40.  Parkland attempted to set a meeting with VC to discuss MP's return to school.  *See id.* ¶ 41.  VC resisted initial attempts to meet, but a meeting was ultimately set for February 1, 2019.  *See id.*  The participants on that telephone meeting included VC, Parkland's supervisor of health services, Parkland's coordinator of special education, a supervisor from the Intermediate Unit, a representative from the office of MP's neurologist, a case manager from an outside agency, and an interpreter.  *See id.* ¶ 42.

During the February 1 meeting, VC and the case manager stated that MP had been hospitalized since January 27, 2019, and that in-patient rehabilitation may be required after MP's discharge.  *See id.*  VC agreed to notify Parkland two weeks before MP's release from any rehabilitation so that the IEP team could meet and discuss MP's needs.  *See id.*  Moreover, Parkland agreed to excuse MP's absences through February 1, 2019.  *See id.*

   VC did not call or respond to Parkland after MP's hospitalization ended.  *See id.* ¶ 43. MP did not attend any rehabilitation facility after her discharge.  *See id.*  Efforts to hold an IEP meeting with the guardian were unsuccessful.  *See id.*

On March 7, 2019, MP's primary care physician informed Parkland that MP "was able to return to school" and recommended that MP "return to school at that time."  *See id.* ¶ 44.  The letter indicated that MP was hospitalized from January 27, 2019 to February 6, 2019, and it further indicated that MP had a feeding tube placed on December 6, 2018.  *See id.*  Following receipt of this letter, and in light of MP's long absence from school, Parkland contacted the Department of Children and Youth to report the truancy.  *See id.* ¶ 45.

On April 8, 2019, VC's counsel emailed Parkland, requesting an IEE at public expense. *See id.* ¶ 46.  VC sought reevaluations including, an "evaluation by a bilingual psychologist, an augmentative communication evaluation, a feeding evaluation, a physical therapy evaluation, and an occupational therapy evaluation."  *See id.*  The email also requested compensatory education, assignment of a one-to-one nurse, and reimbursement of VC's attorney's fees.  *See id.*

On April 24, 2019, Parkland, through its counsel, responded to the IEE request.  *See id.* ¶ 47.  Parkland indicated that VC had unilaterally withdrawn MP from school on November 8, 2018, and MP had not returned to school since that date.  *See id.*  Parkland's response requested clarification from VC's counsel whether they intended to withdraw the IEE request in light of

MP's extended absence from school.  *See id.*  VC did not reply to Parkland's response.  *See id.* ¶ 48.  Parkland did not file a due process complaint or offer to pay for the IEE.  *See id.*

On May 3, 2019, an IEP team meeting for MP was held, and VC attended the meeting. *See id.* ¶ 49.  An IEP was developed for MP at that meeting.  *See id.*  On May 6, 2019, VC returned MP to school.  *See id.* ¶ 45.  However, MP did not attend school regularly after returning.  *See id.*

On May 16, 2019, MP's primary care physician sent a letter to Parkland, indicating that MP should have a one-on-one nurse throughout the school day.  *See id.* ¶ 50.  Parkland made a one-on-one nurse available for the remainder of the 2018–2019 school year as well as the 2019 summer extended school program.  *See id.*  Parkland also contracted with a nursing provider to provide one-on-one nursing for the 2019–2020 school year.  *See id.*  However, during the summer and fall of 2019, VC failed to respond to requests for information from the nursing provider, which prevented the provider from beginning services.  *See id.*  VC eventually responded to the requests for information in October of 2019.  *See id.*

In approximately September of 2019, Parkland learned that MP's aunt, who had been translating documents from English to Spanish for VC, had moved out of state.  *See id.* ¶ 53.  As a result, Parkland began to send documents to VC in Spanish.  MP did not regularly attend school during the 2019–2020 school year.  *See id.* ¶ 54.  When MP did attend school, she made progress on her IEP goals.  *See id.* ¶ 52.  The long periods of absence and failure to make use of extended summer school programs impaired MP's progress on her IEP goals.  *See id.* ¶¶ 52-53.

## IV.    CHO CONCLUSIONS OF LAW AND PRESCRIBED RELIEF

Based on these factual findings, the CHO reached several conclusions.  First, the CHO concluded that "the IEPs developed by the school district were reasonably calculated to provide

meaningful educational benefit to the student in view of the student's individual circumstances," and further concluded that Parkland implemented the IEP in all material aspects. *See HO/FD Conclusions of Law ¶¶ 16, 19 ("HO/FD COL ¶ __").* The CHO also concluded that the "Multiple Disabilities Support – Functional classroom operated by the Intermediate Unit at a high school in the district is the least restrictive environment appropriate for this student." *See id.* ¶ 18. Moreover, the CHO concluded that Parkland "afforded [VC] an opportunity to meaningfully participate in the IEP process and in [MP's] education." *See id.* ¶ 17.

With respect to Plaintiffs' Section 504 claim, the CHO concluded that Parkland "did not discriminate against [MP] on the basis of disability in violation of Section 504." *See id.* ¶ 20. However, with respect to Plaintiffs' claim regarding their request for an IEE, the CHO concluded that Parkland failed to, "without unnecessary delay, file for a due process hearing in response to the guardian's request for an [IEE] . . . ." *See id.* ¶ 21. Accordingly, the CHO concluded Parkland was "in violation of the IDEA in that respect." *See id.* Finally, the CHO concluded that VC "obstructed and impeded provision of a free appropriate public education by the school district." *See id.* ¶ 22.

In prescribing relief for Parkland's failure to appropriately respond to Plaintiffs' IEE request, the CHO instructed that Parkland "be ordered to conduct training for district staff who are involved in responding to [IEE] requests by parents of students with a disability." *See HO/FD 35.* The CHO denied all other requested relief. *See id.*

## V.    LEGAL STANDARDS

### A.    Review of Agency Decision under the IDEA – Review of Applicable Law

Courts reviewing an appeal from a state agency's decision under the IDEA apply a "modified de novo standard of review." *See Montgomery Cnty. Intermediate Unit No. 23 v. A.F.*

*ex rel. D.F.*, 506 F. Supp. 3d 293, 302 (E.D. Pa. 2020) (quoting *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012)). Accordingly, courts "must give 'due weight' to the findings of the administrating proceeding (also known as a 'due process hearing' in IDEA parlance)." *See id.* (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010)). In practice, the "due weight" standard instructs that the "factual findings from the administrative proceedings are to be considered prima facie correct." *See id.* at 302-03 (quoting *D.S.*, 602 F.3d at 564). A court must accept the credibility determinations of the agency's hearing officer "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *See id.* Should a court find that a contrary conclusion is warranted, "it is obliged to explain why." *See id.*

"With regard to conclusions of law, the review is plenary." *See id.* (quoting *Rose Tree Media Sch. Dist. v. M.J. ex rel. M.J.*, No. 18-cv-1063, 2019 WL 1062487, at *3 (E.D. Pa. Mar. 6, 2019)). "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *See id.* (quoting *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012)).

**B.     Claim for Denial of FAPE under IDEA – Review of Applicable Law**

The IDEA was drafted to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services deigned to meet their unique needs . . . ." *See* 20 U.S.C. § 1400(d)(1)(A). In order to provide a FAPE, a school district must offer the student an IEP that is "reasonably calculated to enable a child to make progress in light of the child's circumstances." *See Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 998-999 (2017). The Third Circuit has interpreted this standard to require that a district provide the student with a "meaningful

educational benefit[] in light of the student's intellectual potential." *See D.S.*, 602 F.3d at 557

(quoting *Chambers v. Phila. Bd. of Educ.*, 587 F.3d 176, 182 (3d Cir. 2009)).  The IDEA

contemplates that the act of developing the IEP "will be informed not only by the expertise of

school officials, but also by the input of the child's parents or guardians." *See Endrew F.*, 137 S.

Ct. at 999 (citing *Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cnty. v.

Rowley*, 458 U.S. 176, 208-09 (1982)); *see also id.* at 994 (noting IEP procedures "emphasize

collaboration among parents and educations").

The educational program resulting from an IEP must be "appropriately ambitious in light

of [the child's] circumstances." *See id.* at 1000.  Additionally, the IDEA contemplates that states

will establish

> procedures to ensure that, to the maximum extent appropriate, children with
> disabilities . . . are educated with children who are not disabled and that special
> classes, separate schooling, or other removal of children with disabilities from the
> regular educational environment occurs only when the nature and severity of the
> disability is such that education in regular classes with the use of supplementary
> aids and services cannot be achieved satisfactorily . . . .

*See Oberti ex rel. Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204,

1213 (3d Cir. 1993).  This is sometimes referred to as the "least restrictive environment" (LRE)

requirement.  *See id.* at 1209 n.6.

Determining a school district's liability for a violation of the IDEA is a two-part inquiry:

"(1) Has the school district complied with the procedures set forth in IDEA?; and (2) [h]as the

school district fulfilled its obligation to provide the student with a FAPE?"  *See A.F.*, 506 F.

Supp. 3d at 304 (quoting *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010)).  Put

another way, the second part of the inquiry asks whether the student's IEP was "reasonably

calculated to enable a child to make progress appropriate in light of the child's circumstances."

*See Endrew F.*, 137 S. Ct. at 998-999.

C.      **Request for an IEE under the IDEA – Review of Applicable Law**

The IDEA provides parents "the right to an independent educational evaluation at public

expense if the parent disagrees with an evaluation obtained by the public agency . . . ."  *See* 34

C.F.R. § 300.502(b)(1).  When a parent requests an IEE at public expense

> the public agency must, without unnecessary delay, either . . . (i) [f]ile a due process
> complaint to request a hearing to show that its evaluation is appropriate; or (ii)
> [e]nsure that an independent educational evaluation is provided at public expense,
> unless the agency demonstrates in a hearing pursuant to §§ 300.507 through
> 300.513 that the evaluation obtained by the parent did not meet agency criteria.

*See id.* § 300.502(b)(2).

"If the  public agency files a due process complaint notice to request a hearing and the

final decision is that the agency's evaluation is appropriate, the parent still has the right to an

independent educational evaluation, but not at public expense."  *See id.* § 300.502(b)(3).  A

public agency "may ask for the parent's reason why he or she objects to the public evaluation,"

but the agency "may not require the parent to provide an explanation . . . ."  *See id.*

§ 300.502(b)(4).  The agency "may not unreasonable delay either providing the independent

educational evaluation at public expense or filing a due process complaint . . . ."  *See id.*  "A

parent is entitled to only one independent educational evaluation at public expense each time the

public agency conducts an evaluation with which the parent disagrees."  *See* § 300.502(b)(5)

D.      **Section 504 Claim & Americans with Disabilities Act Claim– Review of**

**Applicable Law**

Section 504 of the Rehabilitation Act provides that "'[n]o otherwise qualified individual

with a disability . . . shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination' under any program

that receives federal funds."  *See Ridley*, 680 F.3d at 280 (quoting 29 U.S.C. § 794(a)).  To

establish a violation of § 504, a parent must show:

(1) the child was disabled;

(2) the child was "'otherwise qualified' to participate in school activities";

(3) the school district received "federal financial assistance"; and

(4) the child was "excluded from participation in, denied the benefits of, or subject to discrimination" by the district.

*See id.* (citing *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999)).

The Third Circuit has explained that "§ 504's 'negative prohibition' is similar to the IDEA's 'affirmative duty' and also requires schools that receive federal financial assistance to 'provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction.'" *See id.* (quoting *W.B. v. Matula*, 67 F.3d 484, 492-93 (3d Cir. 1995)). Accordingly, "a school district must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." *See id.* (citing *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (3d Cir. 2000). "The fact that it is more convenient, either administratively or fiscally, to provide services in a segregated manner, does not constitute a valid justification for separate or different services." *See id.* at 281 (quoting *Helen L. v. DiDario*, 46 F.3d 325, 338 (3d Cir. 1995)). "[C]laims brought under Section 504 'are treated as analogous' to claims brought under the ADA, '[b]ecause the remedies, procedures, and rights under the ADA are the same as those under Section 504." *See J.L. v. Lower Merion Sch. Dist.*, No. 20-1416-KSM, 2021 WL 949456, at *9 (E.D. Pa. Mar. 12, 2021) (quoting *T.M. ex rel. T.M. v. Quakertown Cmty. Sch. Dist.*, 251 F. Supp. 3d 792, 813 (E.D. Pa. 2017)).

E.      **Exhaustion of Remedies under the IDEA – Review of Applicable Law**

"When plaintiffs bring non-IDEA claims seeking relief that can be obtained under the IDEA, they must exhaust those claims through the IDEA administrative process." *See id.* at *4 (citing 20 U.S.C. § 1415(l)). "Non-IDEA claims require exhaustion under the IDEA administrative process when the 'gravamen' of the plaintiff's complaint indicates that the plaintiff seeks relief for the denial of a FAPE." *See id.* (citing *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017)). Even where a plaintiff seeks remedies unavailable under the IDEA, she is "still required to exhaust when damages sought overlap[] with damages available under the IDEA." *See id.* (citing *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 276 (3d Cir. 2014)).

F.      **Recovery of Attorney's Fees under the IDEA – Review of Applicable Law**

Under the IDEA, "the court, 'in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability.'" *W.H. v. Schuykill Valley Sch. Dist.*, 954 F. Supp. 2d 315, 331 (E.D. Pa. 2013) (quoting 20 U.S.C. § 1415(i)(3)(B)). "To qualify as a prevailing party, a plaintiff must 'succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *See id.* (quoting *John T. ex rel. Paul T. v. Del. Cnty. Intermediate Unit*, 318 F.3d 545, 555 (3d Cir. 2003). "The 'touchstone' of the inquiry is 'the material alteration of the legal relationship of the parties.'" *See id.* (quoting *John T.*, 318 F.3d at 555).

"When determining a fee award, an important factor 'that may lead the district court to adjust the fee upward or downward' is the prevailing party's 'degree of success.'" *Rena C. v. Colonial Sch. Dist.*, 840 F. App'x 676, 682 (3d Cir. 2020) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)). In cases involving "a common core of facts," the Third Circuit recently

cautioned against viewing the case "as a series of discrete claims."  *See id.* (quoting *Hensley*, 461 U.S. at 435).  Rather, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."  *See id.* (quoting *Hensley*, 461 U.S. at 435); *see also id.* at 682 n.9 ("Where the relief sought differs from the relief obtained because the prevailing party lost on some issue, that lost issue directly relates to a party's lack of success in obtaining the relief it sought.").

## VI.   DISCUSSION

### A.    MP's Claim for Denial of FAPE

Plaintiffs first assert that MP was denied a FAPE through several violations of the IDEA by Parkland.  Specifically, MP claims that Parkland (1) failed to appropriately evaluate MP, (2) failed to establish IEP goals reasonably calculated to provide meaningful educational benefit for MP, (3) failed to include VC in the drafting and development of the IEP, and (4) failed to implement certain key components of MP's IEP.  The CHO concluded that Parkland appropriately evaluated MP, sufficiently included VC in the drafting process, drafted IEP goals that were reasonably calculated to provide meaningful educational benefit, and appropriately implemented those components of the IEP.  Plaintiffs' argue that the CHO's conclusions are rooted in factual and legal error, and accordingly, they seek entry of judgment in their favor on this claim.  Parkland maintains that the CHO's conclusions are sound regarding this claim, and it asks this Court to enter judgment in its favor.  This Court reviews the CHO's facts under the "due weight" standard and conducts a plenary review of the CHO's conclusions of law.  Following such review, this Court agrees with the CHO's conclusion that Parkland did not deny MP a FAPE.  Accordingly, judgment is entered for Parkland on this claim.

### 1.    Evaluation Process

The first step in the development of the IEP is the evaluation process.  In evaluating a

student for an IEP, a district must abide by the guidelines set forth in 20 U.S.C. § 1414.  The

statute states, in relevant part, that

> [i]n conducting the evaluation, the local educational agency shall--
> (A) use a variety of assessment tools and strategies to gather relevant functional,
> developmental, and academic information, including information provided by the
> parent . . . ;
> (B) not use any single measure or assessment as the sole criterion for determining
> whether a child is a child with a disability or determining an appropriate educational
> program for the child; and
> (C) use technically sound instruments that may assess the relative contribution of
> cognitive and behavioral factors, in addition to physical or developmental factors.

20 U.S.C. § 1414(b)(2).  The statute further provides that it is the responsibility of the agency to

ensure that

> (A) assessments and other evaluation materials used to assess a child under this
> section--
>     (i) are selected and administered so as not to be discriminatory on a racial
> or cultural basis;
>     (ii) are provided and administered in the language and form most likely to
> yield accurate information on what the child knows and can do academically,
> developmentally, and functionally, unless it is not feasible to so provide or
> administer;
>     (iii) are used for purposes for which the assessments or measures are valid
> and reliable;
>     (iv) are administered by trained and knowledgeable personnel; and
>     (v) are administered in accordance with any instructions provided by the
> producer of such assessments;
> (B) the child is assessed in all areas of suspected disability;
> (C) assessment tools and strategies that provide relevant information that directly
> assists persons in determining the educational needs of the child are provided; and
> (D) assessments of children with disabilities who transfer from 1 school district to
> another school district in the same academic year are coordinated with such
> children's prior and subsequent schools, as necessary and as expeditiously as
> possible, to ensure prompt completion of full evaluations.

*Id.* § 1414(b)(3).

Here, MP was evaluated on multiple occasions, using various assessments and strategies that covered multiple areas of actual and suspected disability.  As early as November of 2017, Parkland held an IEP meeting, which included VC, to evaluate MP's needs and develop an initial IEP.  *See* HO/FD FOF ¶¶ 17-18.  In March of 2018, a far more comprehensive report was compiled, overseen by Certified School Psychologist Donna Rile.  *See id.* ¶ 25; *see also* R1. 325, N.T. 142:12-15.  This report was compiled using a variety of assessments and strategies, including review of records, input from VC, observation from Rile, teacher input, and individual assessments from three external service providers including an occupational therapist, physical therapist, and speech pathologist.  *See* HO/FD FOF ¶ 25.

In May of 2018, the Intermediate Unit's feeding team conducted a second feeding evaluation of MP.  *See id.* ¶ 27; *see also* R1. 529-33.  This evaluation also involved various methods of assessment, including an in-person observation of MP while at school and an interview with VC.  *See* R1. 529-30.  This report resulted in specific feeding strategies for MP. *See id.* at 532.  The information from the March 2018 and May 2018 evaluations was used to develop an IEP for MP on May 7, 2018.  *See* HO/FD FOF ¶ 29.

Plaintiffs argue that the CHO was incorrect in concluding that these evaluations were appropriate.  Specifically, Plaintiffs point to four areas that they argue warrant a finding that Parkland's evaluations were insufficient under the § 1414 guidelines.  Each concern is discussed in turn below.  In summary, none of the concerns raised by Plaintiffs warrant reaching a conclusion contrary to that of the CHO.

First, Plaintiffs argue that Parkland did not make use of a formal cognitive assessment of MP during the evaluation process.  *See* Pls.' Mot. 46, ECF No. 24.  The Record belies this argument.  In the report prepared on May 7, 2018, Parkland notes that a "formal cognitive

assessment was attempted but was unable to be completed as [MP] exhibited no consistent response to verbal or nonverbal prompts or test stimuli." *See* R1. 524.  Contrary to Plaintiffs' contention, Parkland made an effort to perform a formal cognitive assessment, but was unable to do so due to MP's inconsistent responses to stimuli.  Plaintiffs fail to point to any non-testimonial evidence that would warrant reaching a different conclusion.  Accordingly, this argument does not warrant entry of judgment in Plaintiffs' favor.

Second, Plaintiffs argue that the evaluations were inappropriate because they were not conducted in Spanish.[4]  *See* Pls.' Mot. 48-49.  However, the record evidence indicates that this argument is unavailing.  As mentioned immediately above, the most recent reevaluation report indicates that MP does not respond to either "verbal or nonverbal prompts or test stimuli." *See* R1. 524.  Another portion of the report notes that MP did not respond to her name being called and that MP "does not appear to react directly to verbal stimuli in either language." *See id.* at 523-24.  It appears from these reports that the language of the evaluations had no effect on the results.[5]  Plaintiffs do not point to any non-testimonial evidence that would warrant a different conclusion on this issue.  Accordingly, this argument does not warrant entry of judgment in Plaintiffs' favor.

Third, Plaintiffs argue that MP's feeding needs were not appropriately evaluated.  *See* Pls.' Mot. 51-52.  Plaintiffs only point to one specific area of concern that they say was not

---

[4]     To the extent that this argument involves the opportunity for VC to participate in the IEP development process, it is discussed below in section VI.A.2, *infra*.

[5]     Although Plaintiffs' point out that the May 2018 reevaluation report indicates that MP "seems to smile when staff says words in Spanish with her," that same report indicates that MP exhibited similar positive responses to non-Spanish and even non-verbal communication as well. *See* R1. 526-527.  Moreover, as this most recent report notes, her response to both verbal and non-verbal stimuli is inconsistent, so much so that a formal cognitive assessment could not be completed. *See id.* at 524.  Accordingly, Plaintiffs have not shown that MP's evaluation was inappropriate because it was not conducted in Spanish.

appropriately evaluated by the school, namely MP's ability to swallow and any attendant risk of aspiration. *See id.* Notwithstanding, the record indicates that this too was appropriately evaluated. Foremost, through an interview with VC, Parkland learned that MP's doctors had not, to date, indicated any issue with swallowing. *See* R1. 523. Notwithstanding, in an observation conducted as part of a feeding evaluation of MP, the evaluator noted that MP "has a history of severe dysphagia . . . and exhibits poor oral motor control, delayed swallow and slow bolus transfers with an inconsistent audible swallow." *See id.* at 532. The report further noted that "[t]hese signs are characteristic of increased risk of aspiration."[6] *See id.* Accordingly, the evaluation of MP did include assessment of her ability to swallow foods and liquids and the attendant aspiration risk. Plaintiffs do not point to any non-testimonial evidence that would warrant a different outcome on this issue.

Finally, Plaintiffs argue that MP's speech and language evaluation was insufficient because the evaluator did not use certain forms of high-tech "Augmentative and Alternative Communication" (AAC) in evaluating MP. *See* Pls.' Mot. 52-53. Specifically, Plaintiffs take issue with the evaluator's use of low-tech AAC in her assessment of MP. *See id.* The CHO credited testimony from the evaluator that trialing high-tech AAC would not have been productive. Specifically, the evaluator testified that MP's functional abilities did not meet the "foundational skills" needed for high-tech AAC, and therefore, the evaluator trialed only low-tech AAC. *See* R1. 209, N.T. 423:1-16. Accordingly, the use of high-tech AAC was considered

---

[6]     Although VC suggested the use of a "large syringe" to provide liquids to MP, the Special Education Coordinator at Parkland indicated that such a method "was not a safe way to feed [MP] because there would be no way to know if she was engaging in the swallowing portion of the liquid that was being forced in." *See* R1. 148. Moreover, the Coordinator indicated that Parkland would only feed MP if she was "alert and awake." *See id.* at 149. This testimony further supports that swallowing and any attendant aspiration risk were considered by Parkland in its evaluation of MP.

by the evaluator and declined in light of MP's functional abilities.  *See id.*  Plaintiffs do not point

to any non-testimonial evidence that warrants a contrary finding of fact on this issue.

Accordingly, this argument does not warrant judgment in Plaintiffs' favor.

Finding that Plaintiffs have not met their burden to overturn the CHO's factual findings

or the conclusions of law drawn therefrom, this Court agrees with the CHO's conclusion that

Parkland's evaluation of MP was appropriate.

## 2.      Drafting of IEP/Inclusion of Guardian

The next step in the IEP process involves development of the IEP, and therein, goals that

are reasonably calculated to provide the student with a meaningful educational benefit.  *See D.S.*,

609 F.3d at 557 (quoting *Chambers*, 587 F.3d at 182).  In doing so, the agency must keep in

mind the substantive requirement that it place the student in the least-restrictive learning

environment.  *See id.* at 556-57.  Moreover, the development of the IEP is meant to be a

collaborative process, and it should involve the input of the parent or guardian.  *See Endrew F.*,

137 S. Ct. at 999.

The CHO determined that the goals in the IEP were reasonably calculated to provide MP

a meaningful educational benefit and that the IEP placed MP in the least-restrictive learning

environment.  *See* HO/FD COL ¶¶ 16, 18.  In addition, the CHO concluded that VC was

provided meaningful opportunities to participate in the IEP development process.  *See id.* ¶ 17.

Plaintiffs disagree with the CHO's conclusion on both issues.  First, Plaintiffs argue that

the goals in the IEP were not reasonably calculated to provide MP a meaningful educational

benefit.  Primarily, Plaintiffs assert that one of MP's goals in her Parkland IEP was identical to a

discontinued goal from an old IEP in another district.  *See* Pls.' Mot. 23-24.  Second, Plaintiffs

assert that VC was not provided meaningful opportunities to participate in the IEP development

process.  *See id.* at 27-29.  Both of these issues are addressed below.  In summary, Plaintiffs do not point to any non-testimonial evidence that warrants a different factual finding on these issues.  Accordingly, under the facts as the CHO has found them, this Court agrees with the CHO's conclusions that the IEP goals were reasonable, and that Parkland offered VC meaningful opportunities for participation.

Plaintiffs first argue that the goals in MP's IEP were not reasonably calculated to provide her a meaningful educational benefit.  Specifically, Plaintiffs point to MP's eye-gaze goal.  This goal, per MP's November 2017 IEP, states that "[g]iven a choice of 2, [MP] will select the correct answer to the questions being asked with 80% accuracy on 4 out of 5 attempts when utilizing eye gaze."  *See* R1. 425.  The goal also included short term benchmarks, which gradually increased the target accuracy from 40% to 60% and then up to 80%.  *See id.*  This eye-gaze goal was reiterated in MP's March 2018 IEP and May 2018 IEP.  *See id.* at 508; R2. 18.

As Plaintiffs point out, a similar goal also appeared in a previous IEP prepared for MP in a school district outside of Pennsylvania.  In that out-of-state IEP, prepared by the Kennedale Independent School District in Kennedale, Texas, the goal stated, "[g]iven a choice of two items, [MP] will select the correct item to a question being asked 80% 4 out of 5 attempts.  She will use eye-gaze to make her choice."  *See* R3. 113, ECF No. 5-2.  However, in the Kennedale IEP, there were no interim goals by which to measure MP's progress.  *See id.*  Plaintiffs assert that Kennedale discontinued this goal due to lack of progress, and they argue that Parkland's adoption of that discontinued goal shows that it was unreasonable.

Notwithstanding, as is more thoroughly discussed in section VI.A.3, *infra*, MP did in fact make progress towards the eye-gaze goal.  The May 2018 IEP indicates that, during the quarter measured, MP "has selected the correct answer to the questions being asked with an average of

60% accuracy over all of the trials . . . ."  *See* R2. 18.  Accordingly, despite Plaintiffs' insistence

that the goal was unreasonable, MP made progress towards the goal during the time in which she

was in school at Parkland.  Accordingly, Plaintiffs have failed to point to non-testimonial

evidence that would warrant contrary findings of fact with respect to MP's eye-gaze goal.

Therefore, this Court agrees with the CHO's conclusion that the goal was reasonable.

Second, Plaintiffs argue that MP was denied a FAPE because VC was not provided

meaningful opportunity to participate in the IEP development process.  Specifically, Plaintiffs

argue that Parkland was required to send documents home to VC in Spanish.  *See* Pls.' Mot. 27-

29.  This issue was discussed at length by the CHO, who credited the testimony of Parkland

officials.  In that testimony, Parkland officials indicated that MP's aunt, who had participated in

some of the IEP discussions, told Parkland that it was appropriate to send documents home in

English.  *See* R1. 186, N.T. 331:6-21; *id.* at 351, N.T. 248:21-25; *id.* at 358, N.T. 276:20-23.

VC's sister would then translate the documents for VC.   Crediting the testimony of the Parkland

officials, the CHO concluded that Parkland had been permitted to send documents home in

English, and VC could not now claim that no such permission was given.  Plaintiffs do not

provide any non-testimonial evidence to warrant a contrary finding of this fact.

Plaintiffs further claim that VC was not provided a meaningful opportunity to advise the

IEP development process.  Notwithstanding, the testimony and documents credited by the CHO

reveal that this was not the case.  First, Parkland arranged for an interpreter service to translate

the IEP meetings to Spanish for VC.  *See* HO/FD FOF ¶ 19.  Moreover, the CHO found that VC

actively participated in these IEP meetings regarding a number of issues.  *See id.* ¶ 20.  In

addition, the CHO found that Parkland made multiple efforts to schedule an IEP meeting with

VC following MP's extensive absence from school, and VC resisted requests to meet.  *See id.* ¶ 41.

Beyond the testimonial evidence, the documents in the record also evidence participation by VC in the IEP development process.  *See* R1. 416, 499 (detailing conversations with VC regarding MP that ultimately informed MP's IEP); R2. 9, 101 (same).  Plaintiffs do not provide any non-testimonial evidence that warrants a contrary finding of these facts.  On these facts, this Court agrees with the conclusion of the CHO that VC was offered meaningful opportunities to participate in the IEP development process.

### 3.    Implementation of the IEP

Plaintiffs' final challenge with respect to their denial of FAPE claim involves Parkland's implementation of the IEP.  Specifically, Plaintiffs argue that Parkland failed to implement the IEP in three key aspects.  First, Plaintiffs argue that Parkland did not appropriately program for MP's alertness and nutritional needs.  *See* Pls.' Mot. 24-25, 32.  Second, Plaintiffs argue that Parkland failed to provide one-on-one nursing to MP.  *See* Pls.' Resp. 18-26.  Third, Plaintiffs argue that Parkland failed to provide educational services to MP at home, resulting in the denial of a FAPE.  *See* Pls.' Mot. at 14-21.  Notwithstanding, Plaintiffs fail to point to any non-testimonial evidence that warrants a contrary finding of the facts regarding these claims.  Moreover, on the facts as the CHO has found them, this Court agrees with the CHO's conclusion regarding the appropriateness of the IEP implementation.

### a.    Parkland appropriately programmed for MP's alertness and nutritional needs.

Plaintiffs argue that Parkland failed to appropriately program for MP's alertness and nutritional needs.  Beginning with her alertness, MP's IEPs included two goals that sought to

address her alertness during the school day.  First, the IEPs included the goal, "[w]hen given daily classroom activities at various times throughout the day, [MP] will actively participate by keeping her eyes open and completing 100% of the activity 4 out of 5 trial when probed weekly." *See* R1. 509.   The baseline for this first goal was 8.6%.  *See id.* at 513.   The second alertness goal stated, "[p]resented with environmental sounds or music, [MP] will be able to respond to auditory stimuli to increase her alertness by independently turning her head to the direction of the sound, 4 out of 5 times probed weekly."  *See id.* at 510.  The baseline for this goal was 33%. *See* R2. 20.

A review of the May 2018 IEP shows that MP was making progress in each of these goals.  When given a classroom activity, MP had actively participated by keeping her eyes open an average of 74% over the course of the academic quarter.  *See id.* at 19.  Although MP had not yet achieved 50% participation in 4 out of 5 events on a weekly basis, this was a marked improvement from her baseline of 8.6%.  *See id.*  With respect to the auditory stimuli goal, MP improved to 47% responsiveness from a 33% baseline.[7]  Despite Plaintiffs' assertions, the record evidence shows that MP was making progress towards these alertness goals.  Moreover, as the CHO credited, one of the impediments to MP's progress towards these goals was her extended absences from school.  *See* HO/FD FOF ¶ 51.  Plaintiffs have not pointed to any non-testimonial evidence that would warrant a contrary finding of these facts.  Accordingly, under the facts as the

---

[7]     While 47% may not seem like tremendous improvement over the 33% baseline, this improvement must be viewed in light of MP's functional abilities.  Importantly, MP's reevaluation notes that she "was unable to localize to sound" at the time of the evaluation.  *See* R1. 524.  In addition, the speech and language pathologist indicated that when MP was asleep, "the speech and language pathologist was unable to find any type of auditory or tactile simulation that would wake [MP]."  *See id.*  Accordingly, MP's improvement beyond the baseline on this goal is significant in light of the functional abilities that the evaluators observed.

CHO found them, this Court agrees with the conclusion of the CHO that Parkland appropriately programmed for MP's alertness and appropriately implemented those programs.

Plaintiff next asserts that Parkland failed to appropriately support and program for MP's nutritional needs.  Plaintiff argues that MP was not getting enough food or liquid intake during school hours, largely due to the fact that MP was sleeping during the meal periods of the school day.

However, the record evidence credited by the CHO indicates that Parkland worked appropriately to ensure that MP was receiving the nutrition she needed.  It is well documented in the record, and even acknowledged by VC, that it was difficult at times to get MP to drink water or other liquids.  *See* R1. 474.  On one occasion in April of 2016, prior to her enrollment in Parkland, MP was hospitalized after she did not eat for a week.  *See id.*  VC told Parkland that she sometimes uses a large syringe to feed MP.  *See id.*  Parkland did not feel that use of such an implement was safe given the aspiration risk it presents.  *See id.* at 148, N.T. 596:22–597:8.

Beyond the instruments used to aid MP in feeding, Plaintiffs take issue with Parkland's records regarding feeding.  Plaintiffs note that the records indicate that, some days, MP was asleep for the majority of the day and was therefore unable to eat.  However, as these records also indicate, the support staff made their best efforts to wake MP up for feeding.  *See, e.g.*, R2. 41; *see also id.* at 41 (indicating in a letter to VC that Parkland staff "does [their] best to wake [MP] up when she is sleeping" and that MP "is often very deeply asleep and will not wake up").[8]

---

[8]     It is important that MP's evaluations be viewed as a whole.  In addition to the aspiration risks that generally accompanied her feedings as a result of Rett's Syndrome, Parkland staff were also hindered by MP's sleepiness during the school day.  *See* R1. 524 (noting when MP was asleep, "the speech and language pathologist was unable to find any type of auditory or tactile simulation that would wake [MP]").  Moreover, Parkland maintained a practice of feeding MP only when she was fully alert and awake so as to reduce the risk of aspiration.  *See id.* at 149, N.T. 599:4-7.

Certain documents that Plaintiffs cite as indicating MP did not get a feeding actually indicate that she had received one. *See, e.g.*, R2. 64 (noting MP "was fast sleep for snack and lunch" but also noting "[MP] had her g-tube feeding around 11:45"). Moreover, of the nineteen "High School Daily Activity Log[s]" provided in the record, sixteen of them indicate that MP ate some or all of her food that day. *See* R2. 59-79. Two Activity Logs indicate that MP was asleep all day, despite Parkland's efforts to wake her, and that she did not eat "by mouth" those days. *See id.* at 66, 73. Only one Activity Log indicates that MP was asleep all day and does indicate whether she ate by mouth or otherwise. *See id.* at 77.

Plaintiffs raise further concerns regarding MP's nutritional health at the beginning of the 2018–2019 school year, noting that she lost weight. *See* Pls.' Resp. 17. However, MP's nutrition was largely out of Parkland's hands at that time. During the period beginning September 10, 2018 and ending January 31, 2019, MP was absent for a total of sixty-one days of school. *See* R3. 77. Of those sixty-one days, only 10 of them are marked as "due to medical reasons," "health reasons," or "health issues." *See id.* Over the entirety of the 2018–2019 school year, MP was absent for approximately 129 days. *See id.* at 77-78. With a typical grade-school academic year spanning 180 days, MP was absent for over 71% of the 2018–2019 academic year. Accordingly, for a large portion of the 2018–2019 school year, MP was not attending Parkland regularly, and during those absences, MP's nutritional regimen was administered instead by VC. After review of the record and Plaintiffs' arguments, Plaintiffs have not pointed to any non-testimonial evidence that would warrant findings of fact contrary to those of the CHO. On these facts, this Court agrees with the CHO's conclusion that Parkland appropriately programmed for MP's nutritional needs, despite MP's long periods of absence from Parkland.

              **b.**        **Parkland did not fail to provide one-on-one nursing services to**

**MP.**

Plaintiffs next argue that Parkland failed to provide one-on-one nursing services to MP. In his Final Decision, the CHO concluded that Parkland "assigned a one-on-one nurse after receiving a doctor's order . . . ." *See* HO/FD 25-26.  Moreover, the CHO concluded that Parkland "provided appropriate nursing services to meet [MP's] needs." *See id.* at 25.  In reaching this conclusion, the CHO explicitly credited the testimony of Parkland staff. *See id.* at 26.

Plaintiffs fail to point to any non-testimonial evidence that would warrant overturning the credibility determination of the CHO.  Notably, the testimony credited by the CHO indicates that Parkland did in fact provide a one-on-one nurse. *See* R1. 332, N.T. 171:4-16.  On May 16, 2019, Parkland received a letter from MP's primary care physician that indicated MP could return to school and further indicated that she would require a one-on-one nurse. *See* R2. 166.  After receipt of that letter, Parkland provided a one-on-one nurse for MP for the remainder of the 2018–2019 school year. *See* R1. 332, N.T. 171:4-16.  To do so, Parkland coordinated with the Intermediate Unit to make use of the Intermediate Unit's nursing service provider. *See id.* at 333, N.T. 174:2-6.  Parkland's efforts to migrate MP's care to its own nursing provider for the 2019–2020 school year were hindered by Plaintiffs' unresponsiveness to Parkland's requests for the necessary information. *See id.* at 332, N.T. 172:14–173:6.

Plaintiffs essentially ask this Court to reconsider the credibility determinations of the CHO. *See* Pls.' Resp. 25 ("[T]here is reason to call into question the witnesses [sic] credibility . . . .").  In light of Plaintiffs' failure to point to any non-testimonial evidence to warrant a different finding of fact, such reconsideration of a witnesses' credibility would be inappropriate.

Accordingly, on the facts as the CHO found them, this Court agrees that Parkland provided appropriate nursing services to MP.

> **c.**     **Parkland did not fail to implement the IEP by declining to provide MP educational services at home.**

Finally, Plaintiffs argue that Parkland's declination to provide educational services to MP at home was a failure to implement the IEP and therefore a denial of a FAPE.  Plaintiffs point to the requests by MP's neurologist and MP's primary care physician that MP be educated at home, citing both as proof that MP belonged in home schooling.  Notwithstanding, Plaintiffs do not point to any non-testimonial evidence that warrants a finding of fact different from that of the CHO on this issue.  Accordingly, on the facts as the CHO found them, this Court agrees with the CHO's conclusion that Parkland did not fail to implement the IEP by not providing home educational services.

Each of MP's IEPs indicate that the IEP will be implemented at "Parkland [Senior High School]."  *See* R1. 431; R2. 26.  The IEPs further note that MP "will be utilizing a functional curriculum in a Multiple Disabilities Functional Support program/classroom for all her instruction except assemblies, appropriate school activities, and Community Based Instruction with support."  *See* R1. 431; R2. 26.  The CHO concluded that this environment was the "least restrictive environment" for MP's education.  *See* HO/FD COL ¶ 18; *see also Oberti*, 995 F.2d at 1213.

The CHO found that, despite the terms of the IEP, VC wished to have MP educated at home.  *See* HO/FD FOF ¶¶ 35, 37.  On two occasions, Parkland received letters from members of MP's medical team requesting that MP be permitted to proceed with home-based schooling. *See id.* ¶¶ 34, 36.  On November 12, 2018, MP's neurologist sent Parkland a "Temporary

Medical Excusal" form and included with it a prescription for home-based schooling for MP. *See id.* ¶ 34. Notwithstanding, when Parkland followed up regarding the excusal form, the neurologist's office indicated that they issued the temporary medical excusal form because VC represented to the neurologist that it was in fact *Parkland* who wanted MP to be home-schooled. *See id.* ¶ 35. Shortly thereafter, on November 28, 2018, Parkland received a letter from MP's primary care physician, similarly requesting home-based schooling. *See id.* ¶ 36. Again, when Parkland followed up on the request, the physician's office indicated that it was VC who requested home-based schooling for MP, and it was the opinion of the physician's office that MP remain in school. *See id.* ¶ 37.

Despite the guidance from MP's medical providers that she remain in school, VC remained "adamant" that MP be educated from home. *See id.* ¶ 40. This sentiment was communicated to Parkland through MP's neurologist on January 21, 2019. *See id.* In light of the conflict between the guidance from MP's medical providers and VC's wishes—and considering MP's extended absence from school,[9] Parkland decided to convene a meeting with VC to discuss how to proceed. *See id.* ¶ 41. During the meeting, which was held on February 1, 2019, VC updated Parkland as to MP's health status, indicating that MP may need rehabilitation following her most recent hospitalization. *See id.* ¶ 42. As a result, VC and Parkland agreed that VC was to contact Parkland two weeks before MP was to be released from rehabilitation so that MP's IEP could be reviewed in light of her needs at that time. *See id.* Notwithstanding, MP did not attend rehabilitation, and VC did not contact the district after MP's hospitalization to review her

---

[9]    As of January 21, 2019, MP had been absent for fifty-five school days since the start of the 2018–2019 school year.

IEP.  *See id.* ¶ 43.  On March 7, 2019, MP's primary care physician sent a letter to Parkland, indicating that MP was able to return to school and recommending that she do so.  *See id.* ¶ 44.

On these facts, the CHO concluded that Parkland did not deny MP a FAPE by declining to provide home-based educational services.  Despite Plaintiffs' arguments to the contrary, this Court agrees with the CHO's conclusion.  Some district courts have determined that where a student's absenteeism becomes excessive and is a documented aspect of the student's disability, the district has an affirmative duty to address the absenteeism.  *See R.B. ex rel. Parent v. Mastery Charter Sch.*, 762 F. Supp. 2d 745, 760 n.91 (E.D. Pa. 2010) (citing *Springfield Sch. Comm. v. Doe*, 623 F. Supp. 2d. 150, 159 (D. Mass. 2009)).  These cases also recognize that a school may appropriately address the absenteeism by reconvening the IEP team to reevaluate the student's needs.  *See id.*

While it is clear that MP's absences were excessive and well-documented, Parkland made numerous appropriate efforts to address the issue.  First, Parkland followed up with MP's medical providers regarding the need for home-based schooling.  *See* HO/FD FOF ¶¶ 35, 37.  Second, when it became clear that VC was adamant about having MP schooled in the home, Parkland convened a meeting that included VC, a representative of MP's neurologist, numerous health services and special education service officials from the district, and MP's external case manager.  *See id.* ¶ 42.  During this meeting, VC and Parkland agreed to reconvene MP's IEP team to assess her current needs.  *See id.*  Notwithstanding, VC did not contact Parkland to reconvene the IEP team, and instead, Parkland received confirmation from MP's primary care physician that MP was able to return to school and should be returned to school.  *See id.* ¶¶ 43-44.

Accordingly, under these facts, Parkland responded appropriately to MP's absences by attempting to address them through an IEP meeting that involved VC.  Parkland did not deny MP a FAPE by declining to provide home-based educational services under these circumstances.  Therefore, this Court agrees with the CHO's conclusion on this matter.  Moreover, this Court agrees with the CHO's overarching conclusion that Parkland did not deny MP a FAPE, and therefore, judgment is entered in Parkland's favor on this claim.

**B.      MP's Claim for Denial of Request for IEE**

MP next argues that the CHO erred in selecting the appropriate relief for Parkland's violation of 34 C.F.R. § 300.502(b)(2).  Section 300.502(b)(1) provides a parent the right to an IEE at public expense where the parent disagrees with the result of the agency's evaluation.  *See id.* § 300.502(b)(1).  When a parent requests an IEE,  the agency must, without unreasonable delay, either (1) provide the IEE at public expense or (2) file a due process complaint to request a hearing to show that its evaluation was appropriate.  *See id.* § 300.502(b)(2).

The CHO determined that Parkland violated § 300.502(b)(2) by failing to either provide the IEE or file a due process complaint.  The CHO noted that Parkland never carried out either of the two options required of it.  However, the CHO concluded that this amounted to no more than a "harmless procedural violation."  *See* HO/FD 34.  While this Court agrees with the CHO's conclusion that Parkland violated § 300.502(b)(2), this Court disagrees with the CHO's conclusion that the violation was harmless.  Accordingly, this Court reverses the CHO's provision of relief on this claim and prescribes appropriate relief.

**1.      Parkland violated 34 C.F.R. § 300.502(b)(2).**

Plaintiffs first requested an IEE in a letter dated April 8, 2019.  *See* R2. 138-41.  Parkland responded to the request on April 24, 2019.  *See id.* at 143-46.  Therein, Parkland did not indicate

that it would either provide the IEE or file a due process complaint to defend its evaluations. Rather, Parkland defended its evaluations in the letter and suggested Plaintiffs withdraw their request for an IEE. *See, e.g.*, *id.* at 145 ("[T]he District appropriately evaluated MP's needs throughout her enrollment."); *see also id.* ("I would respectfully suggest that you withdraw your IEE requests . . . ."). Accordingly, rather than take one of the two actions required by § 300.502(b)(2), Parkland shifted the burden to Plaintiffs to indicate whether the IEE request was withdrawn or sustained.

In fact, Parkland *never* provided the IEE or filed a due process complaint to defend its evaluation. Parkland defends its inaction as justified by Plaintiffs' failure to indicate whether they would withdraw their IEE request. However, as § 300.502(b)(2) makes clear, the burden here was on Parkland, not on Plaintiffs. Indeed, while Parkland was within its rights to ask Plaintiffs for a reason for the IEE, Parkland could not require Plaintiffs to provide an explanation for the IEE request. *See* 34 C.F.R. § 300.502(b)(4). Here, Plaintiffs' letter-request for the IEE provides reasons for their request, and Parkland's requirement that Plaintiffs indicate withdrawal of the request goes beyond the scope of what Parkland may require of Plaintiffs.

Accordingly, this Court agrees with the CHO's conclusion that Parkland violated § 300.502(b)(2). Notwithstanding, the CHO erred in concluding that the violation amounted to a harmless procedural error.

### 2. The CHO's rationale for limiting relief for Parkland's violation is unavailing.

In limiting the relief to Plaintiffs for Parkland's violation of § 300.502(b)(2), the CHO engaged in a balancing of "equities," finding several facts balanced against providing MP with

full relief for Parkland's violation.  *See* HO/FD 34-35.  These considerations were inappropriate, and this Court reverses the CHO's decision with respect to the relief he prescribed.

In balancing the equities against relief for Plaintiffs, the CHO first concluded that Plaintiffs had not placed Parkland on notice of the evaluations at issue.  The non-testimonial, extrinsic evidence shows that this factual finding was incorrect.  In the letter dated April 8, 2019, Plaintiffs listed a number of areas in which independent reevaluation was requested.  *See* R2. 139-41.  By way of example, MP requested an "independent OT evaluation."  *See id.* at 141.  In its response letter, Parkland states that it completed an Occupational Therapy Reevaluation on January 10, 2018.  *See id.* at 145.  Accordingly, it is apparent from Parkland's response that Parkland was aware of the evaluations that MP sought to challenge. [10]

Moreover, courts have read § 300.502(b)(1) to permit a parent to perform a private reevaluation *before* seeking reimbursement from the school district.  *See Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 87 (3d Cir. 1999) ("[T]he parents' failure to express disagreement with the District's evaluations prior to obtaining their own does not foreclose their right to reimbursement." (citing *Hudson ex rel. Tyree v. Wilson*, 828 F.2d 1059, 1065 (4th Cir. 1987))).  Under these principles, and in light of Parkland's clear understanding that Plaintiffs were requesting an IEE, the CHO erred in balancing Plaintiffs' notice to Parkland against relief.

Second, the CHO improperly relied on MP's absence from school as a basis for limiting relief for Parkland's violation.  Nowhere do the relevant provisions indicate that MP may not

---

[10]    Parkland's response letter clearly identifies Plaintiffs' letter-request as one for an "IEE." *See* R2. 146.  In light of the list of evaluations that Plaintiffs provided in their letter and Parkland's response thereto, it was inappropriate for the CHO to find that Parkland did not know what evaluations Plaintiffs took issue with.

obtain an IEE at public expense after reaching a certain number of absences.  While this Court does not disturb the CHO's factual findings regarding MP's extended absences, the matter of absence does not alter Parkland's responsibility under § 300.502(b)(2) to provide the IEE at public expense or file a due process complaint without undue delay.  Accordingly, the CHO improperly weighed this fact against the provision of relief to Plaintiffs.

Finally, the CHO inappropriately limited relief on the ground that Parkland's evaluations of MP "were appropriate and consistent with the requirements of the IDEA."  *See* HO/FD 34. The appropriateness of Parkland's evaluations is inapposite to the question of whether Parkland was required to act pursuant to § 300.502(b)(2).  Section 300.502(b)(3) states, "*[i]f the public agency files* a due process complaint notice to request a hearing and the final decision is that the agency's evaluation is appropriate, the parent still has the right to an independent educational evaluation, but not at public expense."  *See* § 300.502(b)(3).  The import of this language is clear: In order to benefit from a finding that the agency's evaluations are appropriate, the *agency itself* must have filed the due process complaint.  Here, because Parkland failed to file a due process complaint altogether, Plaintiffs are owed an IEE at Parkland's expense.  This Court is not alone in its reading of § 300.502(b)(3).  *See Jefferson Cnty. Bd. of Educ. v. Lolita S.*, 581 F. App'x 760 (11th Cir. 2014) (affirming CHO conclusion that school district was obligated to pay for IEE where it failed to either provide the IEE at public expense or file a due process complaint to defend its evaluation; rejecting school district's argument that deficiency of parents' IEE request obviated need for district response in accordance with § 300.502(b)(3)); *Evans v. Dist.*

*No. 17 of Douglas Cnty., Neb.*, 841 F.2d 824 (8th Cir. 1988) (requiring school district to pay for IEE where district never initiated due process claim to defend its evaluations).[11]

Here, Parkland did not file the due process complaint.  Rather, MP filed the due process complaint as a result of Parkland's inaction.  To allow Parkland to benefit from its inaction, in spite of the clear language of §§ 300.502(b)(2)-(3), would be to create an absurdity.  If this were the case, no agency would have an incentive to initiate a due process complaint to defend its evaluation.  Rather, the preferred course for the agency would be one of inaction, inappropriately placing the burden on the parents to file a due process complaint to vindicate their rights under § 300.502(b)(1).  To find such a result acceptable would be to render the affirmative language of § 300.502(b)(2)-(3) superfluous.

Since Parkland did not initiate the due process complaint, Parkland is not shielded by the CHO's determination that its evaluations were appropriate.  While this Court does not disturb that finding of fact, the fact itself does not protect Parkland from its violation of § 300.502(b)(2).  Accordingly, because Parkland violated the requirements of § 300.502(b)(2), MP is owed an IEE at public expense.  Section 300.502(b)(5) indicates that "[a] parent is entitled to only one independent educational evaluation at public expense each time the public agency conducts an

---

[11]     While two other courts have excused a district's failure to act on its obligations under § 300.502, the facts of those cases are readily distinguishable from the facts here.  *See Smith v. James C. Hormel Sch. of Va. Inst. Of Autism*, No. 3:08cv00030, 2009 WL 4799738 (W.D. Va. 2009) (excusing failure of district to file due process complaint where district had not yet completed any evaluation that parents could be challenging); *A.L. ex rel. L.L. v. Chicago Pub. Sch. Dist. No. 299*, No. 10 C 494, 2011 WL 5828209 (N.D. Ill. 2011) (excusing district's failure to file due process complaint where parents and district reached agreement that the district itself was to conduct additional evaluations of student).  Unlike the school districts in *Smith* and *A.L.*, Parkland had completed multiple evaluations as of Plaintiffs' request for an IEE, and Plaintiffs had not reached any agreement with Parkland to complete further evaluations in lieu of an IEE.

evaluation with which the parent disagrees."  *See* § 300.502(b)(5).  Thus, Plaintiffs are entitled to one IEE at Parkland's expense.

C.    **MP's Section 504 Claim**

Plaintiffs next move for judgment as a matter of law on their Section 504 claim. Parkland moves for judgment in its favor on the claim.  Plaintiffs' memorandum in support of their Section 504 claim indicates that it is premised on the same facts that support their claim for denial of a FAPE.  *See* Pls.' Mot. 32 ("As discussed thoroughly above, [MP] was denied services and accommodations during medical excusals, denied nursing services, and denied other services to improve nutritional intake and alertness during the school day.  These combined failures excluded MP from participating in the programs available to her non-disabled peers.").

For the reasons discussed at length above, this Court agreed with the CHO's conclusion that Parkland did not deny MP a FAPE.  Moreover, this Court concluded that Plaintiffs had failed to present any non-testimonial evidence to warrant different findings of fact on that claim. Accordingly, on the facts as the CHO found them, this Court agrees with the CHO's conclusion that Parkland did not violate Section 504.  Therefore, Parkland is awarded judgment as a matter of law on Plaintiffs' Section 504 claim.

D.    **MP's ADA Claim**

1.    **Subject Matter Jurisdiction exists over MP's ADA claim.**

Parkland first asserts that this Court's lacks subject matter jurisdiction over MP's ADA claim.  Specifically, Parkland claims that MP failed to raise this claim before the CHO, and accordingly, MP failed to exhaust administrative remedies before bringing the claim before this Court.  This argument is unavailing, and this Court does have subject matter jurisdiction over MP's ADA claim.

Courts recognize that the ADA "extends the nondiscrimination rule of Section 504 to services provided by any public entity (without regard to whether the entity is a recipient of federal funds . . .)." *See J.L.*, 2021 WL 949456, at *9 (quoting *Travis G. v. New Hope-Solebury Sch. Dist.*, 544 F. Supp. 2d 435, 445 (E.D. Pa. 2008)). Accordingly, "claims brought under Section 504 'are treated as analogous' to claims brought under the ADA, '[b]ecause the remedies, procedures, and rights under the ADA are the same as those under Section 504." *See id.* (quoting *T.M.*, 251 F. Supp. 3d at 813). Accordingly, under similar circumstances, district courts have concluded "that by fully litigating their Section 504 claim before the hearing officer, [p]laintiffs adequately exhausted their ADA claims through the IDEA's administrative processes." *See id.* Here, Plaintiffs fully litigated their Section 504 claim before the CHO. Accordingly, this Court finds that Plaintiffs appropriately exhausted their administrative remedies, and this Court may hear Plaintiffs' ADA claim.

### 2.     This Court affirms the CHO's disposition of MP's ADA claim.

As the Court indicated above, "claims brought under Section 504 'are treated as analogous' to claims brought under the ADA . . ." *See id.* Since this Court agrees with the CHO's conclusion that MP has failed to make out a violation of Section 504, this Court similarly concludes that MP has failed to make out a violation of the ADA. Accordingly, Parkland is awarded judgment as a matter of law on MP's ADA claim.

### E.     Parkland's Counterclaim

In its sole counterclaim, Parkland asserts that the CHO erred in requiring Parkland to train its staff regarding the IEE process. Parkland argues that such relief was improper following the CHO's finding that Parkland's violation of § 300.502(b)(2) amounted to harmless procedural error. Notwithstanding, as this Court discussed above, the CHO's finding of harmless error was

inappropriate.  Parkland failed to perform its obligations under § 300.502(b)(2)-(3), and this failure deprived MP of an IEE at public expense.  Accordingly, because this Court reverses the CHO's prescribed relief for this violation, this Court dismisses Parkland's counterclaim that concerns that same relief.

      **F.**     **MP's Claim for Attorney's Fees**

Plaintiffs' seek to recover attorney's fees from Parkland stemming from the above claims.  The IDEA provides that a prevailing party in the litigation may recover reasonable attorney's fees from the opposing party.  *W.H.*, 954 F. Supp. 2d at 331 (quoting 20 U.S.C. § 1415(i)(3)(B)).  A party is considered "prevailing" if that party "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."  *See id.* (quoting *John T.*, 318 F.3d at 555).  In evaluating the reasonableness of the requested fee recovery, a Court may consider the degree to which the relief sought differs from the relief obtained.  *See Rena C.*, 840 F. App'x at 682 n.9.

In this litigation, Plaintiffs brought claims for (1) denial of a FAPE, (2) violation of § 300.502(b)(2), (3) violation of Section 504, and (4) violation of the ADA.  As discussed above, Plaintiffs' Section 504 claim and ADA claim were merely extensions of their claim for a denial of a FAPE.  Accordingly, this litigation was primarily comprised of two major claims: the denial of FAPE claim and the § 300.502(b)(2) claim.  Following this Court's review of the CHO's findings of fact and conclusions of law, Plaintiffs are the prevailing party on one of those two claims.  Namely, Plaintiffs prevail on their § 300.502(b)(2) claim.  Accordingly, because Plaintiffs are a prevailing party on a significant issue in this litigation, they may recover reasonable attorney's fees from Parkland.

Having prevailed on one of their two major claims, it initially appears that Plaintiffs should be permitted to recover approximately 50% of the fees reasonably accumulated.  The Court instructs the Plaintiff to provide documentation to establish and substantiate their attorney's fees, as set forth in the Order that accompanies this Opinion.  Moreover, this Court instructs both parties to provide supplemental briefing on the matter of the reasonable fee to be recovered as set forth in that same Order.

## VII.   CONCLUSION

Following a review of the CHO's findings of fact under the "due weight" standard and this Court's plenary review of the CHO's conclusions of law, the Court concludes as follows:

(1)     Parkland is awarded judgment as a matter of law on Plaintiffs' denial of FAPE claim, Plaintiffs' Section 504 discrimination claim, and Plaintiffs' ADA discrimination claim.

(2)     Plaintiffs are awarded judgment as a matter of law on their claim under § 300.502(b)(2) that Parkland failed to appropriately respond to their request for an IEE. Parkland must provide Plaintiffs with one IEE at Parkland's expense.

(3)     In light of this Court's reversal of the relief prescribed by the CHO for Parkland's violation of § 300.502(b)(2), Parkland's counterclaim regarding the CHO's prescribed relief is dismissed.

(4)     Plaintiffs, having prevailed on a significant issue in the litigation, may recover reasonable attorney's fees.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge